**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

THE BRONX DEFENDERS, THE LEGAL AID SOCIETY,          Civil Action No.
BROOKLYN DEFENDER SERVICE, QUEENS LAW                 1:20-cv-5420
ASSOCIATES NOT FOR PROFIT CORPORATION d/b/a
QUEENS DEFENDERS, NEIGHBORHOOD DEFENDER
SERVICE OF HARLEM, and
NEW YORK COUNTY DEFENDER SERVICE,

                                         Plaintiffs,          **COMPLAINT**

-against-

THE OFFICE OF COURT ADMINISTRATION, and
LAWRENCE K. MARKS, in his official capacity as
Chief Administrative Judge of the Unified Court System.
-------------------------------------------------------------------------X

## <u>PRELIMINARY STATEMENT</u>

1.      In the midst of the sustained and devastating novel coronavirus pandemic, which continues
to disproportionately affect low-income people of color, New York City's legal services
organizations (collectively "Plaintiffs" or "Public Defenders") bring this civil rights lawsuit to
challenge a criminal court plan to commence unnecessary in-person appearances without
adequately accommodating people with medical vulnerabilities that put them at serious risk of
illness and death from COVID-19, conditions that constitute protected disabilities under federal
law.

2.      On July 9, 2020, after months of assurances that in-person appearances were not imminent
and that the Office of Court Administration ("OCA") would continue to collaborate with Plaintiffs
and their health and safety experts to address ongoing concerns about the safety of courthouses
while continuing to focus on remote video appearances, Defendants abruptly issued an order (the

"In-person Order" or "Plan") announcing that in-person attendance would resume in criminal courts across New York City within the week. Defendants have withheld critical information from Plaintiffs about the Plan and have operated the Plan chaotically across courts and boroughs, making it impossible for the Public Defenders to predict which cases will be calendared for appearances. Indeed, the Public Defenders commonly receive less than 48 hours' notice of which cases out of the many thousands of pending cases will require appearances in courthouses for which there remains no clear plan for ensuring people's safety from the transmission of COVID-19, and for proceedings that in many cases are unlikely to either advance any significant governmental objective or due process. In this way, the Plan discriminates against people with disabilities who need sufficient notice to seek and receive accommodations or modifications prior to an appearance in order to obtain equal access to the court.

3.      Plaintiffs have at least hundreds of clients and staff members who have medical vulnerabilities that put them at great risk of serious illness or death from COVID-19.[1] On the eve of the rushed and unnecessary reopening of courts contemplated by the In-person Order, Plaintiffs' clients with these disabilities face the tragic and illegal choice between their fundamental right to participate in their own cases and their health and safety. Meanwhile, their attorneys who have these disabilities will be forced to potentially forgo the process currently developed by Plaintiffs to request and receive reasonable accommodations or modifications and instead endanger their lives in order to access to the courts and represent their clients. These untenable choices will endanger the lives of thousands of New Yorkers by perpetuating the spread of this virus and burden the constitutional rights to access the courts and to due process of law. The Americans with

---

[1] Throughout this Complaint, wherever the medical needs of staff or clients are referenced, Plaintiffs intentionally do not disclose personal identifying information. Plaintiffs do not waive and specifically preserve all medical, privacy, and attorney-client privileges.

Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") forbid Defendants from forcing people with disabilities to make these choices.

4.     Defendants' actions related to the In-person Order have forced Plaintiffs to divert resources away from their missions in order to gather and coordinate information among their offices to assess, respond to, and counsel clients and staff about the In-person Order's violation of their civil rights.

5.     On July 12, 2020, Plaintiffs sent a letter to Defendants outlining these concerns and asking for a pause in in-person appearances and a resumption of collaborative planning for a safe reopening. Plaintiffs' letter alerted Defendants that the timing of the In-person Order, its lack of clarity, and the lack of information about which clients and staff will need to attend proceedings would deny clients with disabilities and their attorneys with disabilities access to the proceedings. As of this filing, Defendants have not agreed to a pause or to otherwise modify the Plan to accommodate people with disabilities.

6.     Plaintiffs seek declaratory and injunctive relief in the form of an order finding Defendants out of compliance with Title II of the ADA and Section 504 and directing Defendants to pause the implementation of the In-person Order and resume the deliberative process of collaboratively working with Plaintiffs toward a safe reopening plan that protects the rights and safety of all New Yorkers.

## JURISDICTION AND VENUE

7.     This action is authorized by 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 42 U.S.C. § 1983. Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) because this action seeks redress for violations of Plaintiffs' rights under federal statutes and the Fourteenth Amendment to the United States Constitution.

8.    Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief.

9.    This Court has authority to award costs and attorneys' fees under 29 U.S.C. § 794a(b) and 42 U.S.C. § 1988.

10.    Venue is proper in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of New York.

## **PARTIES**

11.    Plaintiff THE BRONX DEFENDERS ("BxD") is a public defender organization that provides innovative, holistic, and client-centered criminal defense, family defense, civil legal services, and social work support to roughly 30,000 indigent people in the Bronx and elsewhere each year. BxD currently has approximately 3,391 clients facing criminal prosecution, 112 attorneys in our criminal defense practice assigned to represent those clients, and an additional 34 investigators and social workers who assist in and support that representation.

12.    Plaintiff THE LEGAL AID SOCIETY ("LAS") is the oldest and largest private non-profit legal services agency in the nation, dedicated since 1876 to providing quality legal representation to low-income New Yorkers. It has served as New York's primary public defender since 1965 and is now the largest social justice law firm in New York City. LAS provides holistic criminal defense representation and social work support to over 135,000 indigent people in New York City each year. LAS has more than 750 attorneys in its criminal defense practice, and 420 staff who support the representation of clients. Currently, LAS represents clients in more than 32,000 open criminal

cases at the trial court level across the City, and many more on appeal and in parole revocation proceedings.

13.     Plaintiff BROOKLYN DEFENDER SERVICES ("BDS") is a public defender organization that provides multi-disciplinary and client-centered criminal, family, and immigration defense for nearly 30,000 people in Brooklyn every year. In addition to zealous legal defense, BDS provides a wide range of additional services to meet people's unique needs, including social work support, help with housing, benefits, education and employment, and advocacy targeting systems and laws that implicate their rights. BDS currently represents approximately 6,000 people facing criminal prosecution, who are represented by 140 attorneys and 120 non-attorney staff.

14.     Plaintiff QUEENS LAW ASSOCIATES NOT FOR PROFIT CORPORATION d/b/a QUEENS DEFENDERS ("QD") is a public defender organization that provides multi-disciplinary and client-centered criminal, family, and immigration defense for 20,000 people in Queens every year. In addition to zealous legal defense, QD provides a wide range of additional services to meet people's unique needs, including social work support, help with housing, benefits, education and employment, and advocacy targeting systems and laws that implicate their rights. QD currently represents approximately 3,000 people facing criminal prosecution, who are represented by close to 70 attorneys who represent those individuals.

15.     Plaintiff THE NEIGHBORHOOD DEFENDER SERVICE OF HARLEM ("NDS") is a holistic public defender organization that provides criminal defense, family defense, and civil legal services to the residents of Northern Manhattan. NDS has provided legal services to indigent residents of Northern Manhattan for thirty years, and currently has 1,226 clients facing criminal

prosecution. These clients are served by 30 lawyers, 4 social workers, and 3 investigators in the criminal practice.

16.     Plaintiff NEW YORK COUNTY DEFENDER SERVICE ("NYCDS") is a public defender office that functions exclusively in New York County. Since 1997 it has represented indigent people accused of crimes in the criminal courts of Manhattan.  Its seventy-plus attorneys represent approximately 10,000 clients a year and they are assisted in their work by investigators, social workers, paralegals, administrators, corrections specialists, and immigration law experts. NYCDS provides zealous, innovative, and holistic legal representation to its clients while concurrently advocating for large-scale legal reform that would benefit our client communities and strengthen the fairness of our criminal justice system.

17.     Defendant OFFICE OF COURT ADMINISTRATION ("OCA") is the administrative arm of New York court system, an agency under the direction of the Chief Administrative Judge, 25 Beaver St, New York, NY.

18.     Defendant LAWRENCE MARKS is Chief Administrative Judge of the New York Courts (the "Chief Administrative Judge"), with offices at 25 Beaver Street, New York, New York. The Chief Administrative Judge is responsible, on behalf of the Chief Judge, for supervising the administration and operation of the New York Courts. The Chief Administrative Judge is sued in his official capacity.

## FACTS

19.     As explained further below, the In-Person Order came as an abrupt interruption of collaborative planning for a safe reopening of the New York City criminal courts. Under the Plan, the Public Defenders, their staff, and their clients are given little warning of who will have to appear in court. The Plan requires appearances in courthouses that have not yet been deemed safe

by retained medical experts and where those experts have identified problems not yet rectified. The Plan applies to appearances that are not necessary and do not further the rights of people facing criminal prosecution or any legitimate government interest.

20.    Notably, the In-person Order–with its sudden reversal of policy and failure to accommodate people with disabilities–has, upon information and belief, caused the staff and clients of the Public Defenders great distress. The people of New York City have suffered enormous loss and terrifying health and economic conditions as a result of the novel coronavirus pandemic, all in a short period of time. The completely unnecessary rush to throw hundreds of people back into the courts on almost no notice is nothing short of traumatic and irresponsible.

## The Devastating Impacts of and Risks from COVID-19

21.    As of July 13, 2020, COVID-19 has infected over 3.3 million people in the United States and killed 135,205.[2] In New York State alone, estimates range from 24,989 to  over 30,000 deaths.[3] According to the Center for Disease Control and Prevention, numerous common medical conditions place people at increased risk for severe illness or death from COVID-19, including chronic kidney disease, chronic obstructive pulmonary disease, serious heart conditions, sickle cell disease, obesity, and diabetes.[4]

---

[2] Johns Hopkins University & Medicine, Coronavirus Resource Center: Maps & Trends, https://coronavirus.jhu.edu/data/mortality (last visited July 13, 2020).
[3] *Compare* New York State Department of Health, Fatalities, https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (last visited July 13, 2020) *with* CDC COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited July 13, 2020).
[4] Centers for Disease Control and Prevention, People of Any Age with Underlying Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 11, 2020.).

22.     COVID-19 has had devastating health consequences for the Bronx and Queens and people of color, in particular. Nine of the top ten zip codes in New York City with the highest infection rates are in Queens and the Bronx.[5] The Bronx is the City's poorest borough; it has the highest concentration of people of color; and it has experienced the highest tolls of infections, hospitalizations, and deaths.[6]

23.     Data from the City's own health system shows deep disparities in who is affected by COVID-19, with mortality rates tied to race and income. Neighborhoods with the highest concentrations of Black and Latinx people, as well as low-income residents, have suffered the highest death rates.[7] The CDC reports that regardless of age, Latinx and Black people are respectively 4-5 times more likely than white people to be hospitalized due to COVID-19.[8] These same populations are also over-represented in the criminal system and will be disproportionately affected by the In-person Order.

24.     The Public Defenders have clients in criminal proceedings and staff who represent or support representation of those clients who have medical vulnerabilities that put them at greater risk of severe illness or death from COVID-19, including but not limited to asthma, diabetes, heart disease, high blood pressure, obesity, and human immunodeficiency virus. Upon information and

---

[5] Michael Schwirtz and Lindsey Rogers Cook, These N.Y.C. Neighborhoods Have the Highest Rates of Virus Deaths, N.Y. TIMES, May 18, 2020, https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths-nyc.html.
[6] Kimiko de Freytas-Tamura, Winnie Hu and Lindsey Rogers Cook, 'It's the Death Towers': How the Bronx Became New York's Virus Hot Spot, N.Y. TIMES, May 26, 2020, https://www.nytimes.com/2020/05/26/nyregion/bronx-coronavirus-outbreak.html.
[7] Michael Schwirtz and Lindsey Rogers Cook, These N.Y.C. Neighborhoods Have the Highest Rates of Virus Deaths, N.Y. TIMES, May 18, 2020, https://www.nytimes.com/2020/05/18/nyregion/coronavirus-deaths-nyc.html.
[8] COVID-19 in Racial and Ethnic Minority Groups, Center for Disease Control and Prevention, Updated June 25, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

belief, the total number of the Public Defenders' clients and staff with such medical vulnerabilities is at least in the hundreds.

### Executive Orders Suspend the CPL and In-Court Appearances

25.     On March 7, 2020, Governor Cuomo issued Executive Order 202 declaring a state of emergency based on a finding that "travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue." It invokes the Governor's emergency powers, codified in Section 29-a of Article 2-B of the Executive Law, to "temporarily suspend any statute, local law, ordinance, or orders, rules, or regulations, or parts thereof" if "compliance . . . would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster." Pursuant to the Executive Law, such suspension orders "may provide for such suspension only under particular circumstances, and may provide for the alteration or modification of the requirements of such statute, local law, ordinance, order, rule or regulation suspended, and may include other terms and conditions."

26.     On March 12, in Executive Order 202.1, the Governor used his emergency powers to modify criminal proceedings under the Criminal Procedure Law ("CPL"), ordering that:

> the [criminal] court, in its discretion, may dispense with the personal appearance of the defendant, except an appearance at a hearing or trial, and conduct an electronic appearance in connection with a criminal action pending in any county in New York State, provided that the chief administrator of the courts has authorized the use of electronic appearance due to the outbreak of COVID-19, and the defendant, after consultation with counsel, consents on the record. Such consent shall be required at the commencement of each electronic appearance to such electronic appearance.

27.     On March 20, the Governor issued Executive Order 202.8, which suspended, through April 19, 2020, "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law. . . .". The suspension of the CPL was

issued "[i]n accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis." *Id.*

28.     Through Executive Orders 202.14, 202.28, and 202.38, the Governor continued the suspension of the CPL and made certain modifications not relevant here.

29.     As a result of this series of Executive Orders, all appearances in criminal courts in New York City went virtual, such that no one facing criminal prosecution and no criminal defense attorneys were required to attend court appearances in-person.

30.     In EO 202.48, issued on July 6, 2020, the Governor discontinued the suspension of the CPL where, in relevant part, the CPL "requires a personal appearance of the defendant, and there is consent" and "where the Court has been authorized to commence in-person appearances by the Chief Administrative Judge." EO 202.48 goes on to specify certain additional CPL provisions, not relevant here, that remain suspended.

31.     Notably, the Governor's Executive Orders suspend CPL 30.30, through the currently operative EO. Under CPL 30.30, a person facing criminal prosecution has a right to seek dismissal of the charges if the prosecution is not ready to proceed with trial in a certain number of days (the precise number depends on the charges at issue). As long as 30.30 continues to be suspended, any rush in criminal court proceedings is somewhat hollow, from the perspective of the defendant's due process rights, because the prosecutor faces no legal consequence for delaying the ultimate resolution of the case and the defendant has no right to demand resolution. The effect of the In-person Order is to present opportunities to revoke bail and/or obtain guilty pleas without the corresponding right of the defendant to demand a speedy trial, and to increase the chances that defendants will feel pressure to accept a plea in order to avoid remaining in jail indefinitely while their case languishes in a criminal system that is not prepared to offer them due process.

## Deliberative and Collaborative Planning for a Safe Reopening

32.     Over the course of the coronavirus pandemic, the Public Defenders have had regular conversations with the Chief Administrative Judge and other representatives of OCA to facilitate criminal court proceedings in New York City in the face of the enormous threat to health and safety from COVID-19.

33.     For months preceding the filing of this Complaint, the Public Defenders had a weekly call with representatives of OCA and the Mayor's Office for Criminal Justice ("MOCJ"), on which they discussed and planned criminal court operations during the pandemic and in light of the suspension of the CPL and in-court appearances.

34.     On June 5, 2020, the Public Defenders hired CrowdRx, a team of emergency physicians and public safety experts who prescribe and deliver medical services to large gatherings in the United States.

35.     As of June 9, 2020, OCA was aware that the Public Defenders had retained CrowdRx for the purpose of providing an expert opinion as to the safety of the Bronx courthouses and to provide advice and guidance to the Public Defenders, our clients, and the OCA concerning safety measures that should be implemented before resuming in-person court appearances.

36.     On June 24 and 25, 2020, the Supervising Judge of the New York Criminal Court, the Administrative Judge of the Civil Court of the City of New York, and the Deputy Chief Administrative Judge of the New York City Courts participated in tours of nine courthouses in Brooklyn, Manhattan, and the Bronx with CrowdRx and the Plaintiffs' representatives, among others. The goal of these tours was to learn about and provide feedback on the policies and procedures that OCA was considering to re-open the courts to litigants and the public. Throughout these tours, court officials consistently communicated that plans for reopening courts to in-person

appearances and the public were a work in progress, and that many aspects of those plans had yet to be finalized. The June 25, 2020 tour was supposed to include a tour of the Bronx County Hall of Justice, 265 E. 161st Street, but a fire in the building and resulting flood precluded this visit. A new tour of this building has not yet been scheduled. Additional tours of other courthouses had been scheduled but had not been completed when OCA announced the In-person Order, nor indeed at the time of the filing of this Complaint.

37.     Prior to the In-person Order, OCA representatives repeatedly said that they welcomed input from the Public Defenders' experts and that OCA would facilitate discussions between our experts and an epidemiologist retained by OCA.

38.     Prior to the In-person Order, OCA representatives–including the administrative judges of the criminal courts in New York City–said that any return to in-person appearances would be limited to a small number of cases and would only include those cases in which an in-person appearance was necessary.

39.     In the July 6, 2020, weekly call with the Public Defenders, OCA, and MOCJ, New York Criminal Court Administrative Judge Hon. Tamiko Amaker said that any in-person appearances in the near future would be for matters that could not be handled remotely.

### The Public Defenders' Preparations for Reopening

40.     To prepare for in-person appearances, and in reliance on OCA's repeated representations that in-person appearances were not imminent and would be in limited situations where appearance was necessary, the Public Defenders took a number of actions to prepare staff and clients and facilitate appearances in a safe manner.

41.     Relying on assurances from OCA that (1) they welcomed input from CrowdRx and would facilitate discussions between CrowdRx and OCA's expert and (2) in-person appearances were

not imminent and would be limited to those instances in which an in-person appearance was necessary, the Public Defenders indicated to staff not only that a resumption of in-person appearances would be weeks away but that there would be no expectation that they would be required to appear in person until the Public Defenders' experts had deemed the buildings safe for in-person appearances.

42.     Relying on these assurances from OCA, the Public Defenders took actions to ensure that they would be able to (1) meet the needs of their clients once limited in-person appearances resumed at some future date, and (2) maintain the  health and safety of their staff by the time in-person appearances were required, and for those limited in-person appearances that were expected to proceed. At the same time, the Public Defenders continued facilitating operation of remote appearances and engaged in planning for and investment in training and infrastructure to support continued remote appearances that were expected to proceed in the coming months.

43.     The actions taken by the Public Defenders include but are not limited to that BxD created and disseminated a survey of all staff to identify people with medical vulnerabilities, childcare, or family care needs that would prevent them from being able to physically appear in court. Staff had until July 10–the day after the In-person Order was issued–to complete the survey.  BxD is just now beginning to review and synthesize the information obtained in that survey to identify staff members unavailable for in-person appearances and to begin devising a system for ensuring that client needs are met in a way that best meets the needs of individual clients and equitably distributes workload across the practice. That process requires follow up with staff members and thoughtful review and planning; it simply cannot be altered on virtually no notice.

44.     Similarly, LAS had convened a series of working groups comprising a cross-section of LAS's staff–including managers, staff attorneys, investigators and social workers among others–

to develop internal policies and procedures governing remote representation and court reopening and propose policies and procedures to OCA and other external stakeholders. The purpose of these working groups was to ensure that LAS was fully prepared to safely and equitably manage the transition back to in-person representation. These working groups had met several times prior to July 9, when the In-person Order was announced, but were not set to report their final recommendations until later in July–a deadline that, again, was chosen based on OCA representations about the timing of in-person appearances.

45.     BDS and QD too were in the midst of developing a plan to clients facing criminal prosecution to identify people with medical vulnerabilities, transportation, or family care needs that would prevent them from being able to physically appear in court. BDS and QD had not yet fully implemented that information-gathering effort when the In-person Order was issued, and is still gathering and reviewing information. Simultaneously, BDS and QD were working to identify staff members who have medical vulnerabilities, disabilities, child or family care needs, or who would otherwise not be able to physically appear in court. Notably, relying on representations from OCA, certain BDS and QD staff had been given permission to leave the immediate area to shelter-in-place, with the understanding that they would quarantine for two weeks before entering a courthouse or other BDS and QD office. Even those attorneys who returned immediately after the In-person Order was issued are not able to quarantine for the recommended two weeks before in-person appearances resume. Further, BDS and QD are still developing individualized plans to ensure that the needs of clients are addressed while ensuring that necessary accommodations are in place for individual staff members. Developing and implementing these individual plans is a significant undertaking that requires time and planning and cannot be addressed without adequate notice.

46.     Based on all of the above, the Public Defenders advised staff clients on what they can expect in terms of when they would next be required to appear in person in court.

### Unaddressed Warnings from the Expert on OCA Reopening Plans

47.     As of July 9, 2020, when Defendants issued the In-person Order, CrowdRx had already raised significant failures in the courts' reopening protocols that the court had not yet confirmed had been rectified. Among other failures, CrowdRx advised that the courts' failure to have a protocol for screening measures for all persons entering courthouses, including checking the temperatures of people prior to them entering the courthouse and conducting a mandatory daily health survey for employees prior to admitting them to courthouses, created an untenable risk to those in the courthouse and, because of the increased risk of spreading infection, to those in the community in which the courthouse sits.

48.     CrowdRx further noted during their tours that court officers frequently failed to wear masks properly and often removed masks when talking to others. They also observed that some staff were utilizing masks with exhalation valves that release unfiltered air and therefore do not protect others if the wearer is contagious, and that others were using face shields without also wearing a mask.

49.     During the tours, particular concerns were raised over areas in which people in police custody were held. OCA acknowledged that several locations usually used for this purpose were too small and too poorly ventilated to avoid unacceptable risk of COVID-19 transmission. Combined with recent disclosures that testing regimes on Rikers Island have in practice been far less comprehensive than City officials had previously promised and reported, the risk of transmission from incarcerated clients brought to unnecessary court proceedings is high.

50.     It was also made clear during the tours that OCA's epidemiologist was in the process of developing density requirements for each room in the courthouses that would be used for in-person

court appearance, and that those density requirements would be critical to ensuring that appearances could be conducted safely. To date, upon information and belief, those density requirements have not been promulgated.

51.     CrowdRx noted that the prototype of the plexiglass dividers that were installed as models in many courthouses were ineffective and insufficient, leaving areas exposed and failing to separate many of the parties (prosecutors, defenders, clients, judges and court staff) from one another. For example, in the Brooklyn and Bronx Criminal Courts, certain plexiglass dividers did not reach all the way to the bottom of the countertops they were meant to protect. The absence of effective dividers could allow direct transmission of respiratory droplets from infected persons to other people in the same space, and CrowdRx advised greater and more comprehensive use of such dividers.

52.     CrowdRx also observed that the courts' procedures and systems for ensuring the safety of public bathrooms were still in flux, and that policies governing bathroom spacing, cleaning and contact-free products appeared to be under discussion and were not finalized. Similarly, many courthouses had not finalized plans to control traffic flow, and were still installing signage to ensure the possibility of social distancing. In housing courts where such signage was already in place, CrowdRx observed that proposed queuing lines were not always 6 feet apart–underscoring that OCA's courthouse plans suffered from deficiencies as a general matter. Finally, there remained open questions about the adequacy of HVAC and air filtration systems in some courthouses, particularly Bronx County Supreme Court, located in one of the boroughs where transmission rates remain among the highest in the country. In those places, CrowdRx advised the Department of Citywide Administrative Services (DCAS) that filters needed to be upgraded, among other things.

53.     As of the date of this Complaint, CrowdRx has not completed touring the courts and has

not yet rendered their assessment, nor have they had the opportunity to discuss or examine OCA's

epidemiologist's findings, if any.

### Unexpected Issuance of the In-Person Order

54.     On Thursday, July 9, 2020, the Defendants issued the In-person Order, which instructs that

in-person appearance would commence on Wednesday July 15, 2020–only three business days

later.[9]

55.     Pursuant to the In-person Order, "groups" of up to ten criminal cases will be selected for

in-person appearances each day in felony waiver parts in each courthouse, on a rolling basis going

forward. Because there are multiple parts in each courthouse, and each appearance can involve up

to six separate individuals, the Order ensures that large volumes of people will suddenly be

required to present themselves at criminal courthouses and congregate in small spaces inside those

courthouses.

56.     There are no criteria contained in the In-person Order identifying how such cases will be

selected. Instead, the Plan gives administrative judges unilateral authority to select cases for

appearances.

57.     Collectively, the Public Defenders have many thousands of cases that could be subject to

being called on very little notice for an in-person appearance. There is no way to know for certain

which cases will be called unless and until that local judge informs the Public Defenders of the

identity of the case.

---

[9] Other orders have been issued concerning in-person appearances at criminal proceedings in the
New York State Supreme Court. While Plaintiffs do not challenge those orders herein, they
explicitly reserve the right to challenge them, particularly to the extent those orders also violate
the ADA, Rehab Act, and/or Fourteenth Amendment.

58.     Communication has been chaotic at best. In many cases thus far, neither the Public Defenders nor the individual counsel of record received notice of a case being selected until less than 48 hours prior to the appearance. In at least one case, a lawyer received less than 24 hours' notice for an appearance in a case where the client suffers from severe disabilities (asthma, obesity, anemia, bi-polar disorder, and schizophrenia). In some cases, the Public Defenders only learn which cases will require in-person appearances when individual defense attorneys receive emails from the court advising them that a case on which they are counsel of record has been selected under the Plan. In other cases, Public Defenders have only become aware that a case has been called because the client was informed, and the client reached out to the lawyer.

59.     While OCA has an ADA policy that contemplates the possibility of requesting accommodations, including adjournments, for people with disabilities, the failure of the In-person Order to address that ADA policy and the chaotic and sudden implementation of the Order render OCA's ADA policy meaningless. For example, an LAS attorney requested an adjournment of an appearance scheduled for July 15, 2020, based in part on the client's disability-based vulnerability to COVID-19, and the court summarily denied the request on July 14, in a one-line email to the lawyer, saying "[T]he court on later court dates can make accommodations for your client.  I look forward to seeing you tomorrow."

60.     Because the In-person Order applies only to the New York City Criminal Court, and not the Criminal Branch of the Supreme Court, it necessarily applies only to people charged with unindicted felonies and lower-level offenses. Notably, the New York City Criminal Court sits in various buildings throughout the city, including among other buildings the Hall of Justice in the Bronx, where the CrowdRx walkthrough has not been held due to postponement from the fire.

61.     Given that the current Executive Order maintains the suspension of virtually all statutory timelines, including speedy trial under CPL 30.30, there is no urgent matter, in which a client is at liberty, that is pending in these parts and for which an in-person appearance is either necessary or required.

**Harms to Plaintiffs from In-Person Order**

62.     At the time the In-person Order was issued, the Public Defenders had not yet, and still have not, completed preparing their plans for safely returning staff and clients to in-court appearances, and the Plan required the Public Defenders to refocus their attention away from those preparations and to divert their resources away from their ordinary and core responsibilities, as further described below.

63.     Because of the In-person Order, the Public Defenders had to convene immediate meetings with internal staff who bear responsibility for managing and supervising their criminal defense representation services to swiftly attempt to prepare operations for the sudden requirement of in-person appearances. This required many hours of work that would otherwise have been used for the management and supervision of the Public Defenders' core representation services.

64.     Because of the In-person Order, the Public Defenders had to undertake the complicated task of asking staff to return to in-person appearances in courthouses that had yet been deemed safe by their experts. This required hours of unexpected and unplanned work; again, this was time that would otherwise be spent on the Public Defenders' core representation services. The Plan exacerbated this complicated task because it lacked any concrete information about policies and procedures to ensure safety once significant numbers of in-person proceedings commence.

65.     Because of the In-person Order, in order to address the needs of staff who are medically vulnerable or who otherwise would not be able to return to the in-court appearances that would be

required, needs unaddressed by the Plan, the Public Defenders took actions that diverted and will continue to divert their resources away from their core responsibilities in the provision of public defense.

66.     This includes but not limited to that BxD, LAS, and QD will send only criminal defense practice leadership to appearances on cases selected. For BxD, this includes the CDP Managing Director, CDP Deputy Director, CDP Legal Director, CDP Training Director, and CDP Director of Professional Development. For LAS, this includes the Attorney in Charge of each borough, or another supervising attorney from that borough. Because of the Plan, these staff must spend at least half a day in court, away from the ordinary work that they do. The diversions are the same for QD.

67.     Because criminal defense practice leadership at BxD, QD, and LAS will be required to spend a half day in court as a result of the Plan's denial of access to people with disabilities, they will not be able to devote their time to the following non-exhaustive list of daily tasks:

    a.   For BxD defense practice leadership: attending internal meetings with members of management as well as leading internal meetings with practice leadership and staff; participating in external meetings as BxD's representative, including meetings with other defenders, OCA, MOCJ, and other city and state agencies; responding to the myriad daily issues arising within managing the practice, including staffing and budgetary matters; supervising; coordinating virtual court appearances for themselves and staff including preliminary hearings; preparing materials and presentations for internal and external trainings; providing legal advice to the practice; and providing conflict analysis and advice.

    b.   For LAS defense practice leadership: attending internal meetings with members of management as well as leading internal meetings with practice leadership and staff; participating in external meetings as LAS's representative, including meetings with OCA, MOCJ, and other city and state agencies; responding to the myriad daily issues arising within managing the practice, including staffing, budgetary matters, supervising; preparing materials and presentations for internal and external trainings.

68.     Similarly, because the Plan denies access to people with disabilities, BDS supervisors are now spending hours identifying attorneys who have no potential need for an accommodation or modification are not required to quarantine who can appear in person on cases assigned to attorneys who cannot appear in person, time that would have otherwise been spent on core responsibilities of defending people who face criminal prosecution.

69.     In the meantime, supervisors at BDS themselves are preparing to appear in person in the event that no attorney who meets that criteria is available or can be identified in time. Such appearances would divert them from their regular responsibilities, including supervising and consulting on other cases and coordinating on court-reopening and other policies with OCA, MOCJ, DOC, and other City and State agencies. These in-person appearances require BDS staff to obtain hard-copies of court-files. In some cases, attorneys have physical possession of these files outside the office to ensure that (virtual) court appearances could continue during the pandemic. Transferring these hard-copy files from attorneys who cannot appear in person to those who can has cost countless hours of the Director of Administration, and significant funds, since the In-person order was issued. This task is nearly impossible when cases scheduled for in-person appearances are identified merely days in advance.

70.     Without sufficient notice of which clients will be required to appear, the Public Defenders are constrained in their ability to advise clients on what appearances will be required; on what kinds of matters; or to prepare them for the appearance.

71.     Without sufficient notice of which clients will be required to appear, the Public Defenders are constrained in their ability to advocate for clients with medical vulnerabilities, because there is insufficient time to identify and understand relevant vulnerabilities prior to the appearance and what if any modification or accommodation might be required or whether appearing in person is

simply not feasible or safe under any circumstances. Getting this vital information on this short notice is nearly impossible.

72.     Because of the lack of certainty concerning which cases would be selected for appearance, the Public Defenders had to expend significant resources since the issuance of the In-person Order, including over the weekend of July 11 and 12, 2020, to develop and begin implementing a triage plan that would address and navigate client and staff needs. This included but is not limited to identifying the pool of clients who could conceivably be affected, developing a plan of outreach to those clients, and beginning outreach to those clients. This effort required criminal practice leadership at the Defender offices to devote hours of time toward pivoting to address the sudden and unexpected process triggered by the In-person Order.

### Unsuccessful Attempt to Reach Agreement with OCA

73.     On Sunday, July 12, 2020, the Public Defenders sent a letter to the Chief Administrative Judge, copying each of the Administrative Judges for each criminal court in New York City, advising of their concern that the In-person Order violated the law and imploring them to pause on in-person appearances and resume collaborative preparations for reopening. In this letter, the Public Defenders advised that they would seek relief in federal court if necessary to prevent the Plan from proceeding.

74.     On Tuesday, July 14, the Chief Administrative Judge informed the Public Defenders that OCA would not pause or modify the Plan.

### FIRST CAUSE OF ACTION
### Violations of Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)

75.     Plaintiffs repeat and reallege all preceding paragraphs.

76.     Title II of the ADA states, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity. 42 U.S.C. § 12132.

77.     A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

78.     Defendants were and are, at all times relevant to this action, "public entities" within the meaning of Title II of the ADA.

79.     Plaintiffs' clients and staff members with health conditions that make them medically vulnerable to serious illness or death from COVID-19 are individuals with disabilities for purposes of the ADA, 42 U.S.C. § 12102, and are "qualified" for the programs, services, and activities being challenged herein. 42 U.S.C. § 12131(2).

80.     The regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against persons with disabilities. 28 C.F.R. § 35.130(b)(3), (8).

81.     A public entity must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . . ." 28 C.F.R. § 35.130(b)(7).

82.     The Title II regulations further require that public entities provide people with disabilities with notice "regarding the provisions of this part and its applicability to the services, programs or activities of the public entity[.]" 28 C.F.R. § 35.106.

83.     Defendants are violating Title II of the ADA by following a policy that does not consider a person's disability and does not provide the reasonable modifications, including but not limited to virtual court appearances and enough advance notice of their court appearance, or even notice

about how to request the reasonable modifications that people with disabilities need to participate safely and equally in court or a reasonable opportunity to request those modifications.

84.     Plaintiffs were and continue to be injured as a result of Defendants actions, and because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

85.     Pursuant to 42 U.S.C. § 12133, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 12205.

## SECOND CAUSE OF ACTION
### Violations of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a))

86.     Plaintiffs repeat and reallege all preceding paragraphs.

87.     Section 504 of the Rehabilitation Act of 1973 provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.] 29 U.S.C. § 794(a).

88.     Defendants were and are, at all times relevant to this action, recipients of federal financial assistance within the meaning of Section 504.

89.     As recipients of federal funding, Defendants may not exclude a person with disabilities from participating in any of their programs or activities.

90.     Plaintiffs' clients and staff members with health conditions that make them medically vulnerable to serious illness or death from COVID-19 are individuals with disabilities for purposes of Section 504, 42 U.S.C. § 12102. 29 U.S.C. § 705(20)(B). They are "qualified" for the programs, services, and activities being challenged herein.

91.     The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria or methods of administration that have the effect of discriminating against persons with disabilities. 28 C.F.R. § 41.51(b)(3).

92.     The Section 504 regulations further require that entities provide people with disabilities with notice regarding the non-discrimination efforts of the entity. 28 C.F.R. 42.505(f).

93.     Defendants are violating Section 504 by following a policy that does not consider a person's disability and does not provide the reasonable modifications, including but not limited to virtual court appearances and enough advance notice of their court appearance, or even notice about how to request the reasonable modifications that people with disabilities need to participate safely and equally in court or a reasonable opportunity to request those modifications.

94.     Plaintiffs were and contiued to be injured as a result of Defendants actions, and because Defendants' discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

95.     Pursuant to 29 U.S.C. § 794(a), Plaintiffs are entitled to declaratory and injunctive relief and to reasonable attorneys' fees and costs incurred in bringing this action.

### THIRD CAUSE OF ACTION
### Violations of Substantive Due Process (Fourteenth Amendment)

96.     Plaintiffs repeat and reallege all preceding paragraphs.

97.     In violation of the Fourteenth Amendment to the United States Constitution, Defendants' conduct constitutes deliberate indifference to the health and well-being of those the Defendants have an obligation to provide due care.

98.     In violation of the Fourteenth Amendment to the United States Constitution, Defendants'

conduct constitutes an arbitrary and excessive use of government power that does not serve any

legitimate governmental interest.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Declare that Defendant's acts, practices, policies, and/or omissions deprive Plaintiffs of

their rights under the Americans with Disabilities Act, the Rehabilitation Act of 1973, and

Fourteenth Amendment to the United States Constitution.

b.  Provide appropriate equitable relief;

c.  Award reasonable attorney's fees and costs;

d.  Grant such other and further relief as this Court deems just and proper.


Date:   July 14, 2020
        New York, New York

                                    */s/ Jenn R. Borchetta*
                                    Jenn Rolnick Borchetta
                                    Seth Packrone
                                    Niji Jain
                                    Thomas Scott-Railton
                                    The Bronx Defenders
                                    360 E. 161st Street
                                    Bronx, New York 10451
                                    (718) 838-7878
                                    jborchetta@bronxdefenders.org

                                    ***Counsel to Plaintiff The Bronx Defenders***

                                    */s/ Corey Stoughton*
                                    Corey Stoughton
                                    Legal Aid Society
                                    199 Water Street
                                    New York, NY 10036
                                    (646) 527 0095 (office mobile)
                                    cstoughton@legal-aid.org

*Counsel to Plaintiff Legal Aid Society*

/s/ *Brooke Menschel*
Brooke Menschel, Esq.
Brooklyn Defender Service
177 Livingston Street, 7th Floor
Brooklyn, NY 11201
(347) 675-3970
bmenschel@bds.org

*Counsel to Plaintiff Brooklyn Defender Service*

/s/ *Arthur J. Robb*
Arthur J. Robb
Ian-Paul A. Poulos
Clifton Budd & DeMaria, LLP
The Empire State Building
350 Fifth Avenue, 61st Floor
New York, NY 10118
212-687-7410
ajrobb@cbdm.com

*Counsel to Plaintiff Queens Law Associates Not for Profit Corporation d/b/a Queens Defenders*

/s/ *Roxanna Gutierrez*
Roxanna Gutierrez
Neighborhood Defender Service of Harlem
317 Malcolm X Boulevard, 10th Floor
New York, NY 10027
(212) 876 5500 (office)
(917) 297 8604 (office mobile)
rgutierrez@ndsny.org

*Counsel to Plaintiff Neighborhood Defender Service of Harlem*

/s/ *Patrick Joyce*
Patrick Joyce, Esq.
70 Lafayette Street- 2d Floor
New York, NY 10013
(212) 285-2299
patrickjoyce.esq@gmail.com

*Counsel to Plaintiff New York County Defender Services*