**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X

THE BRONX DEFENDERS, THE LEGAL AID SOCIETY,       Civil Action No.
BROOKLYN DEFENDER SERVICES, QUEENS LAW       1:20-cv-5420 (ALC)
ASSOCIATES NOT FOR PROFIT CORPORATION d/b/a
QUEENS DEFENDERS, NEIGHBORHOOD DEFENDER
SERVICE OF HARLEM, and
NEW YORK COUNTY DEFENDER SERVICE,

                                 Plaintiffs,

-against-

THE OFFICE OF COURT ADMINISTRATION, and
LAWRENCE K. MARKS, in his official capacity as
Chief Administrative Judge of the Unified Court System,

                               Defendants.
--------------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………………………1

FACTUAL AND PROCEDURAL BACKGROUND………………………………………2

Executive Orders Suspend the CPL and In-Court Appearances…………………………3

Deliberative and Collaborative Planning for a Safe Reopening…………………………4

Unexpected Issuance of In-Person Order……………………………………..…………5

New York's Fragile COVID-19 Plateau………………………………………..…………7

The Risk to Plaintiffs' Clients, Staff, and the Communities they Serve…………..…..…………8

Disruption of Plaintiffs' Operations…………………………………………………… 10

ARGUMENT……………………………………………………………………………12

Plaintiffs are Likely to Suffer Irreparable Harm……………………………………………..13

Plaintiffs Are Likely to Succeed on the Merits of their ADA and Section Claims…..…………16

The Equities and Public Interest Strongly Favor a Temporary Restraining Order……………22

CONCLUSION………………………………………… ……………………………………..24

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alexander v. Choate,* 469 U.S. 287 (1985) ............................................................... 17, 19

*Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).. 17, 21

*Busby v. Bonner*, 2020 WL 3108713 (W.D. Tenn. June 10, 2020) ............................... 18

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253 (S.D.N.Y.),
    *aff'd*, 788 F. App'x 85 (2d Cir. 2019) ...................................................................... 16

*Citigroup Glob. Markets, Inc. v. Mun. Elec. Auth. of Georgia*, No. 14-cv-2903-AKH, 2014 WL
    3858509 (S.D.N.Y. June 18, 2014) .......................................................................... 13

*Coronel v. Decker*, No. 20-cv-2472 (AJN), --- F.Supp.3d ----, 2020 WL 1487274 (S.D.N.Y. Mar.
    27, 2020).................................................................................................................. 14, 23

*Disabled in Action v. Bd. of Elections*, 752 F.3d 189 (2d Cir. 2014) .............................. 18, 19, 20

*Dopico v. Goldschmidt,* 687 F.2d 644 (2d Cir.1982).................................................... 19-20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) ............... 13

*Ferreyra v. Decker*, No. 20 CIV. 3170 (AT), --- F.Supp.3d ----, 2020 WL 1989417 (S.D.N.Y.
    Apr. 27, 2020) ......................................................................................................... 22

*Fraihat v. U.S. Immigration & Customs Enf't*, No. ED-19-cv-1546 (JGB), 2020 WL 1932570
    (C.D. Cal. Apr. 20, 2020)......................................................................................... 18

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ............................... 13, 15

*Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158 (2d Cir. 2005) ...... 22

*Grant v. Decker*, No. 20 CIV. 2946 (AKH), 2020 WL 3402445 (S.D.N.Y. June 19, 2020) ....... 23

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)....................................... passim

*Henrietta D. v. Giuliani*, 119 F.Supp.2d 181 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v.
    Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ................................................................ 14

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) .......................................................... 16

*J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731 (D. Conn. 2018)...................15

*Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019) ............ 14

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ......................................... 13

*New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286 (2d Cir. 2012)... 15

*Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012) ........ 19

*Red Earth LLC v. United States,* 657 F.3d 138 (2d Cir.2011)..................................... 13

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ................................................. 13

*Silver v. City of Alexandria*, No. 1:20-cv-000698, 2020 WL 3639696 (W.D. La. July 6, 2020). 18

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577 (S.D.N.Y.
    2002)........................................................................................................................ 13

*State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*,
    706 F. Supp. 2d 266 (D. Conn. 2010) ...................................................................... 21

*Tennessee v. Lane*, 541 U.S. 509 (2004)................................................................... 16, 19

*United States v. Campagna*, No. 16-cr-78-01 (LGS), 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020)..................................................................................................................................... 14

*United States v. Scparta*, No. 18-CR-578 (AJN), --- F.Supp.3d ----, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) ................................................................................................................ 22

*Velesaca v. Decker*, No. 20 CIV. 1803 (AKH), 2020 WL 2114984 (S.D.N.Y. May 4, 2020)..... 14

## STATUTES

29 U.S.C. § 794(a) .............................................................................................................. 18

42 U.S.C. § 12131(1) .......................................................................................................... 18

42 U.S.C.A. § 12102(1)(a) .................................................................................................. 18

42 U.S.C.A. § 12102(2)(A) ................................................................................................. 18

Title II, Americans with Disabilities Act .......................................................................... 16

## OTHER AUTHORITIES

N.Y. Exec. Order 202.48 ................................................................................................. 3, 24

## REGULATIONS

28 C.F.R. § 160(b) ............................................................................................................. 20

28 C.F.R. § 42.505(e) ......................................................................................................... 17

28 C.F.R. § 42.505(f) ..........................................................................................................17

28 C.F.R. § 35.106(b)(ADA)..............................................................................................17

28 C.F.R. § 35.107(b)(ADA)..............................................................................................17

28 C.F.R. § 35.108(a)(2)(i) ................................................................................................ 18

28 C.F.R. § 35.130(B)(1)(iii) ............................................................................................. 16

28 C.F.R. § 35.130(b)(3) .................................................................................................... 20

28 C.F.R. § 35.130(b)(7) ............................................................................................... 17, 20

28 C.F.R. § 41.51(b)(3)(i) (Section 504) ........................................................................... 17

28 C.F.R. § 41.56 (Section 504)..........................................................................................17

28 C.F.R. § 35.130(b)(7) .................................................................................................... 17

28 C.F.R. § 35.149 (ADA) ................................................................................................. 17

28 C.F.R. § 35.163(a) ......................................................................................................... 20

28 C.F.R. § 41.51(b)(3)....................................................................................................... 20

## PRELIMINARY STATEMENT

As New York City still reels from the devastating health and economic consequences of the novel coronavirus pandemic, and as high infection rates persist in the City's predominantly low-income communities of color, Defendants issued an order suddenly abandoning a functioning system of remote video appearances and requiring people to appear in court for criminal proceedings, when the courts have not yet been deemed safe from COVID-19. Defendants' order (the "In-person Order" or "Plan") does not set forth any system to provide modifications or accommodations to ensure equal access to the courts for people who have medical conditions that put them at significant risk of severe illness and death from COVID-19, conditions that constitute disabilities under federal law. Under the Plan, administrative judges have unilateral authority to select cases for in-court appearances from many thousands of pending cases. In practice, notice is commonly received less than 48 hours from the appearance, making it nearly impossible for the attorney or the defendant to assess the need for, seek, or obtain accommodations or modifications for the appearance. Defendants took no steps whatsoever to meet their affirmative obligations to communicate information about a functioning system for such accommodations or modifications, leaving attorneys and clients scrambling to meet the needs of people with disabilities. The ad hoc system of appealing to individual judges that has arisen amidst this chaos is no system at all, and has led to inconsistent and unjust results. At best, people with COVID-related disabilities are given the option of either appearing–at great risk to their health and lives–or having the appearance proceed without them. In this way, the New York City criminal courts have in one move opened the courthouse doors to the public while closing that door to people with disabilities.

1

The Plan discriminates against people with disabilities in violation of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), and the United States Constitution. By this Order to Show Cause, the Plaintiffs– New York City's legal services organizations (collectively "Plaintiffs" or "Public Defenders")— seek an order returning to the status quo prior to the issuance of the In-Person Order during the pendency of this action, and requiring any plan for reopening of criminal courts to comply with the law. This is a modest request to simply continue the status quo as it existed just a few days ago–a status quo that provided for remote video appearances through which proceedings can and were being held–in order to prevent continued discrimination and protect the public health.

## FACTUAL AND PROCEDURAL BACKGROUND

The Public Defenders have at least hundreds of clients and staff with medical vulnerabilities that put them at significant risk of severe illness or death from COVID-19.[1] *See* Decl. of Ann H. Matthews of The Bronx Defenders ("BxD"), dated July 16, 2020 ("BxD Decl.") at ¶¶ 4, 29, 31; Declaration of Justine M. Luongo of the Legal Aid Society ("LAS"), dated July 16, 2020 ("LAS Decl.") at ¶¶ 2, 4; Declaration of Lisa Schreibersdorf of Brooklyn Defender Services ("BDS"), dated July 16, 2020 ("BDS Decl."); Declaration of Alice Fontier of Neighborhood Defender Service of Harlem ("NDS"), dated July 15, 2020 ("NDS Decl."); Declaration of Stan German of New York County Defender Service ("NYCDS"), dated July 16, 2020 ("NYCDS Decl."); Declaration of Lori Zeno of Queens Defenders ("QD"), dated July 16, 2020 ("QD Decl.") (collectively "PD Decls.").[2] On July 9, 2020, after months of assurances that in-person appearances were not imminent and that the Office of Court Administration ("OCA")

---

[1] Plaintiffs intentionally withhold personal identifying information concerning particular clients and staff. Plaintiffs do not waive and expressly preserve all medical, privacy, and attorney-client privileges.

[2] Throughout, Plaintiffs refer collectively to the Public Defender declarations when each individual declaration supports the statement.

would continue to collaborate with Plaintiffs and their health and safety experts to address ongoing concerns about the safety of courthouses while continuing to focus on remote video appearances, Defendants abruptly issued an order announcing that in-person attendance would resume in criminal courts across New York City within the week. BxD Decl. at ¶¶ 5-10, 16; *see also* BxD Decl. Exhibit A (copy of the In-person Order). The Plan does not address how people with disabilities might seek accommodations to in-person appearances based on vulnerabilities to COVID-19. *Id.* at ¶ 17-19.

Defendants have withheld critical information from Plaintiffs about the Plan and have operated the Plan chaotically across courts and boroughs, making it impossible for the Public Defenders to predict which cases will be calendared for appearances. BxD Decl. at ¶¶ 25-28; 32; LAS Decl. at ¶¶ 32-38; BDS Decl.; NDS Decl.; QD Decl.; NYCDS Decl. Indeed, the Public Defenders commonly receive less than 48 hours' notice of which cases out of the many thousands of pending cases will require appearances in courthouses for which there remains no clear plan for ensuring people's safety from the transmission of COVID-19, and for proceedings that in many cases are unlikely to either advance any significant governmental objective or due process. PD Decls. In this way, the Plan discriminates against people with disabilities who need sufficient notice to seek and receive accommodations or modifications prior to an appearance in order to obtain equal access to the court.

### Executive Orders Suspend the CPL and In-Court Appearances

On March 7, 2020, Governor Cuomo issued Executive Order ("EO") 202 declaring a state of emergency based on a finding that "travel-related cases and community contact transmission of COVID-19 have been documented in New York State and are expected to continue." Through a series of subsequent Executive Orders, Governor Cuomo modified portions

of the Criminal Procedure Law ("CPL"). EO 202.8, issued on March 20, 2020, suspended, through April 19, 2020, "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law. . . ." The Executive Orders also suspended CPL 30.30, which allows a person facing prosecution to seek dismissal of the charges if the prosecution is not ready for trial in a certain number of days. As a result of these Executive Orders, all appearances in criminal courts in New York City went virtual.

After extending the suspension of the CPL through several more Executive Orders, Governor Cuomo issued EO 202.48 on July 6, 2020, discontinuing the suspension of the CPL where, in relevant part, the CPL "requires a personal appearance of the defendant, and there is consent" and "where the Court has been authorized to commence in-person appearances by the Chief Administrative Judge." However, as long as CPL 30.30 continues to be suspended, any rush in criminal court proceedings is somewhat hollow, from the perspective of the defendant's due process rights, because the prosecutor faces no legal consequence for delaying the ultimate resolution of the case and the defendant has no right to demand resolution.

**Deliberative and Collaborative Planning for a Safe Reopening**

Over the past several months, the Public Defenders have had regular conversations with Defendants to facilitate criminal court proceedings in New York City in the face of the enormous threat to health and safety from COVID-19. PD Decls. As part of this effort, on June 5, 2020, the Public Defenders hired CrowdRx, a team of emergency physicians and public safety experts who prescribe and deliver medical services to large gatherings in the United States, to provide an expert opinion about the safety of in-person court appearances. PD Decls. Defendants have known about CrowdRX since at least June 9, and advised Plaintiffs they would consider

CrowdRX's feedback and facilitate communications between them and Defendants' epidemiologist. LAS Decl. at ¶¶ 8-9; 21.

During a series of tours in nine courthouses attended by Defendants, Plaintiffs' representatives, and CrowdRX, court officials consistently communicated that plans for reopening courts to in-person appearances and the public were still in progress, with many issues still outstanding. LAS Decl., *passim*. Additional joint tours had been scheduled but not yet completed at the time of this filing.[3] *Id*. Repeatedly, and as late as July 6—just three days before the issuance of the In-person Order—Defendants assured the Public Defenders in-person appearances in the near future would be limited to a small number of cases where the appearance was absolutely necessary. PD Decls.

### Unexpected Issuance of In-Person Order

On Thursday, July 9, 2020, the Defendants issued the In-person Order, which requires in-person appearances to commence, starting less than one week later on Wednesday July 15, 2020. BxD Decl., Ex. A. The timing of the In-person Order was all the more troubling considering that CrowdRX had raised numerous safety concerns about Defendants' operations and the potential return to in-person appearances that Defendants had yet to resolve. LAS Decl. at ¶¶ 13-20. The In-person Order dictates that "groups" of up to ten criminal cases will be selected for in-person appearances each day in felony waiver parts in each courthouse, on a rolling basis going forward.[4] The In-person Order contains no criteria about how cases will be selected, but instead gives administrative judges unilateral authority to select cases for appearances. In effect, any one

---

[3] Notably, the June 25, 2020 tour was supposed to include a tour of the Bronx County Hall of Justice, 265 E. 161st Street, but a fire in the building and resulting flood precluded this visit. A new tour of this building has not yet been scheduled. LAS Decl. at ¶ 12.

[4] Because there are multiple parts in each courthouse, and each appearance involves, at the very minimum, five separate individuals, the Order ensures that large volumes of people will suddenly be required to present themselves at criminal courthouses and congregate in small spaces inside those courthouses. *See* BxD Decl. at n. 3. In the Bronx yesterday, five cases were scheduled for in person appearances in the same court part at the exact same time, creating even greater concerns for congestion. BxD Decl. at ¶ 33.

of the many thousands of the Public Defenders' cases could be selected for each day, and there is no way to know until the local judge informs Plaintiffs. As of this filing, Public Defenders routinely received less than 48 hours' notice for court appearances, PD Decls., and in at least one case, less than 24 hours' notice was given to a lawyer of a client who has numerous disabilities (asthma, obesity, anemia, bi-polar disorder, and schizophrenia). LAS Decl. at ¶ 58. The methods of notice were haphazard at best, including emailing individual defense attorneys (with no notice to the client) or only reaching out to the client (with no notice to the attorney). PD Decls.

While Defendants have an ADA policy that contemplates the possibility of requesting accommodations,[5] including adjournments, for people with disabilities, the failure of the In-person Order to address that ADA policy and the chaotic and sudden implementation of the Order render OCA's ADA policy meaningless. PD Decls. For example, an LAS attorney requested an adjournment of an appearance scheduled for July 15, 2020, based in part on the client's disability-based vulnerability to COVID-19, and the court summarily denied the request on July 14, in a one-line email to the lawyer, saying "[T]he court on later court dates can make accommodations for your client. I look forward to see [sic] you tomorrow." LAS Decl. at ¶ 64. In many cases, since the filing of this lawsuit, judges are excusing clients from appearances that then go forward without them—such that people facing prosecution are being denied the ability to participate in their own court proceeding because of their disability. LAS Decl. at ¶ 68. In another example, a BxD attorney with medical vulnerabilities to COVID-19 was told to get another attorney to substitute on the appearance—meaning that the appearance would go on without them and they would not be permitted to represent their own client because of their disability. BxD Decl. at ¶ 32. Moreover, since the aforementioned speedy trial rule under CPL

---

[5] New York State Unified Court System, *Covid-19 and ADA Accommodations: Frequently Asked Questions*, June 15, 2020, http://ww2.nycourts.gov/sites/default/files/document/files/2020-06/ADA%20COVID%2019%20FAQs%202020_0.pdf (last accessed July 16, 2020).

30.30 remains suspended, there is no urgent matter, in which a client is at liberty, that is pending in these parts and for which an in-person appearance is either necessary or required. BxD Decl. at ¶ 19.

### New York's Fragile COVID-19 Plateau

The effects of COVID-19 on New York have been, in a word, cataclysmic. COVID-19 has killed more than 32,000 people in New York alone, the second highest death rate in the country.[6] While New York has made progress towards mitigating the danger of COVID-19, it is precisely because of this that it is crucial reopening take place cautiously, deliberately, and with accommodations for those at greatest risk. As Professor Gregg Gonsalves, an expert in infectious diseases at the Yale School of Medicine, explains, danger in New York remains high and the current situation is fragile. Declaration of Professor Gregg Gonsalves, Ph.D., ("Gonsalves Decl.") ¶¶ 6-14. As the state reopens, the risk will increase as the potential avenues for transmission increase. *Id.* ¶ 12. Indeed, the reproduction number—the number of new people each infected person is likely to infect—has recently risen in New York to 1.10, a significant uptick from a low point of 0.67 earlier in the recovery,[7] while recent data show a concerning spike in cases among young people in New York City, *id.* ¶ 7. This risk is dramatically increased by the waves of cases that are crashing across the country. *Id.* ¶ 11-12. Governor Andrew Cuomo recently warned that it is imperative New Yorkers not let their guard down, since "[y]ou're going to see our numbers and the Northeast numbers probably start to increase because the virus that

---

[6] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed July 16, 2020).
[7] *Rt COVID-19*, https://rt.live/ (last accessed July 16, 2020) (with a confidence interval of 0.89 – 1.32); *see also The COVID Tracking Project*, The Atlantic, https://covidtracking.com/ (last accessed July 10, 2020); *National and Subnational estimates for the United States of America*, Center for Mathematical Modeling of Infectious Diseases, https://epiforecasts.io/covid/posts/national/united-states/ (last accessed July 15, 2020) (estimating $R_t$ in New York to be 1.1).

you see now in the South and the West . . . it's is going to come back here."[8] And while states like New York are making efforts to control interstate spread, they simply do not have the capacity to quarantine other states. Gonsalves Decl. ¶ 12.

This risk is compounded by recent data showing that people who recover from COVID-19 may lose their immunity relatively quickly—with one study showing reduced antibody responses as soon as 20–30 days after symptom onset. *Id.* ¶ 9. Similarly, recent studies troublingly indicate that young people are at greater vulnerability from COVID-19 than was previously thought. *Id.* ¶ 19.

### The Risk to Plaintiffs' Clients, Staff, and the Communities they Serve

Against the backdrop of this fragile equilibrium, abruptly requiring individuals to cycle through in-person court appearances significantly increases the risk to them, their attorneys, court staff, and the community at large.

Cycling individuals through congregate, enclosed settings has proven to be one of the most tragically effective modes of transmission. We have already seen this with offices, churches, parties, and bars. *Id.* ¶ 24. Courts are no exception. *Id.* ¶¶ 17, 24 ("With many different people working or passing through closed settings like a courthouse, the chance for person-to-person contact through droplet or airborne transmission is high."). Dr. Laura J. Rasmussen-Torvik, the Chief of Epidemiology in the Department of Preventive Medicine at Northwestern University, recently concluded that "courtrooms represent a high-risk site for the spread of COVID-19" given their similarities to congregate indoor settings that have been documented as

---

[8] Marty Johnson, *Cuomo says Northeast Will Likely See Rise in COVID-19 Cases Due to Surge in Other Parts of Country*, The Hill (Jul. 11, 2020) https://thehill.com/homenews/state-watch/506891-cuomo-says-northeast-will-likely-see-rise-in-covid-19-cases-due-to-surge; Bryan Kirk, *Travelers to New York From High-Risk States Face $2K Fine if They Don't Register*, Newsweek (July 13, 2020), https://www.newsweek.com/travelers-new-york-high-risk-states-face-2k-fine-if-they-dont-register-1517439.

"superspreading events." Declaration of Laura Rasmussen-Torvik, PhD, MPH.[9] Our growing understanding of the risks of "aerosolized" transmission of SARS-CoV-2 underscores why enclosed spaces are so dangerous; rather than being spread only through larger respiratory droplets, studies are increasingly showing risk from smaller "microdroplets" that can expelled while talking and can linger in the air for longer. Gonsalves Decl. ¶ 16.

The fact that Plaintiffs' clients are disproportionately drawn from Black and Latinx communities, BxD Decl. at ¶ 4; LAS Decl. at ¶ 4, which have been hit hardest by COVID-19, only increases the danger of requiring in-person court appearances. Gonsalves Decl. ¶¶ 18, 25. Neighborhoods with the highest concentrations of Black and Latinx people, as well as low-income residents, have suffered the highest death rates. *Id.* ¶ 18. And Black and Latino men face a heightened risk from COVID-19, a risk that is significantly exacerbated if they have even one additional risk factor such as a history of smoking.[10] Further, when low-income individuals must take public transit to arrive in court, this only raises the avenues of transmission and risk to communities further. *Id.* ¶ 17.

This risk is higher still when individuals have preexisting conditions that increase their risk of COVID-19. One CDC report concluded that 78 percent of COVID-19 patients who required intensive care unit admission and 71 percent requiring hospitalization had at least one

---

[9] *Appended as Appendix C to* National Association of Criminal Defense Lawyers (NACDL), *Criminal Court Reopening and Public Health in the COVID-19 Era, NACDL Statement of Principles and Report* (June 2, 2020), https://www.nacdl.org/getattachment/56802001-1bb9-4edd-814d-c8d5c41346f3/criminal-court-reopening-and-public-health-in-the-covid-19-era.pdf?_zs=4u12O1&_zl=8e0r5.

[10] *See generally* Elizabeth J. Williamson et al., *OpenSAFELY: factors associated with COVID-19 death in 17 million patients*, Nature (2020), https://doi.org/10.1038/s41586-020-2521-4; *see also Racial & Ethnic Minority Groups*, Centers for Disease Control and Prevention (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html; *Katherine J. Wu, Study of 17 Million Identifies Crucial Risk Factors for Coronavirus Deaths*, N.Y. Times (July 8, 2020), https://www.nytimes.com/2020/07/08/health/coronavirus-risk-factors.html.

underlying health condition or risk factor.[11] Studies of individual medical conditions including

asthma,[12] smoking,[13] heart disease,[14] liver disease,[15] and hypertension[16] offer similarly troubling

evidence. Individuals with mental health needs are also at heightened risk of experiencing

deterioration of their mental health and are also at greater risk from infectious disease.[17]

While death is the most salient harm from COVID-19, it is far from the only one. More

serious cases can last over six weeks. *Id.* ¶ 19. And for many, recovery does not mean respite.

Recent studies found that for a majority of people symptoms lasted well beyond recovery,

including shortness of breath and chest pain, as well as neurological symptoms such as brain fog

and fatigue. *Id.* At the biological level, there is evidence of lung scarring, damage to heart

muscles, and dangerous interference with the central nervous system. *Id.*

For these reasons, Professor Gonsalves concludes "from a public health perspective,

premature and abrupt relaxations of social distancing through requiring individuals to appear in-

person in courts will increase the health risks to the individuals, their attorneys, court staff, and

the surrounding community" and that "by the time it becomes clear that opening up the courts to

---

[11] *See, e.g.*, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*; CDC COVID-19 Response Team, 69:382–386 (Apr. 3, 2020), http://dx.doi.org/10.15585/mmwr.mm6913e2.

[12] *See, e.g.*, Myvizhi Esai Selvan, *Risk factors for death from COVID-19*, Nature Reviews Immunology (May 27, 2020), https://www.nature.com/articles/s41577-020-0351-0.

[13] *Smoking and COVID-19: Scientific Brief*, World Health Organization (June 30, 2020), https://www.who.int/news-room/commentaries/detail/smoking-and-covid-19.

[14] *See, e.g.*, Dave Fornell, *The Cardiovascular Impact of COVID-19*, Diagnostic and Interventional Cardiology, DAIC *(*June 5, 2020), https://www.dicardiology.com/article/cardiovascular-impact-covid-19.

[15] *See, e.g.*, Shailendra Singh & Ahmad Khan, *Clinical Characteristics and Outcomes of Coronavirus Disease 2019 Among Patients With Preexisting Liver Disease in the United States: A Multicenter Research Network Study*, Gastroenterology (May 3, 2020), https://doi.org/10.1053/j.gastro.2020.04.064

[16] *See, e.g.*, CDC, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET*, 14 States, March 1–30, 2020 (Apr. 17, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[17] *See, e.g.*, Hao Yao, et. al, *Patients with mental health disorders in the COVID-19 epidemic*, The Lancet Psychiatry (Apr. 1, 2020) https://www.thelancet.com/journals/lanpsy/article/PIIS2215-0366(20)30090-0/fulltext; Michael Liebrenz, *Caring for persons in detention suffering with mental illness during the Covid-19 outbreak*, Forensic Science International: Mind and Law 1 (2020), https://www.sciencedirect.com/science/article/pii/S2666353820300060?via%3Dihub; *Management of Physical Health Conditions in Adults with Severe Mental Disorders*, World Health Organization (Nov. 7, 2018), https://apps.who.int/iris/bitstream/handle/10665/275718/9789241550383-eng.pdf?ua=1

legal proceedings has led to clusters of infections, it will likely already be too late to prevent this from spreading to the community at large." *Id*. ¶¶ 23-24.

### Disruption of Plaintiffs' Operations

To prepare for in-person appearances, and in reliance on OCA's repeated representations that in-person appearances were not imminent and would be in limited situations where appearance was necessary, the Public Defenders took a number of actions over the past several months to prepare staff and clients and facilitate in-person appearances in a safe manner. PD Decls. The issuance of the In-person Order has upended the Plaintiffs' operations and forced Plaintiffs to divert substantial resources away from carrying out their core missions. PD Decls.

Because of the lack of certainty concerning which cases would be selected for appearance, the Public Defenders had to expend significant resources since the issuance of the In-person Order, including over the weekend of July 11 and 12, 2020, to develop and begin implementing a triage plan that would address and navigate client and staff needs. PD Decls. This included but is not limited to identifying the pool of clients who could conceivably be affected, developing a plan of outreach to those clients, and beginning outreach to those clients. PD Decls. This effort required criminal practice leadership at the Public Defender offices to devote hours of time toward pivoting to address the sudden and unexpected process triggered by the In-person Order. PD Decls. Notably, without sufficient notice of which clients will be required to appear and because of the timing of the In-person Order, the Public Defenders have been constrained in their ability to advise clients on what appearances will be required and to collect information from their clients about their medical vulnerabilities and advocate for them to get appropriate modifications or accommodations. PD Decls.

To develop this triage plan, the Public Defenders had to convene immediate meetings with internal staff who bear responsibility for managing and supervising their criminal defense representation services to swiftly attempt to prepare operations for the sudden commencement of in-person appearances. PD Decls. This required hours of unexpected and unplanned work that would otherwise have been spent on the Public Defenders' core representation services. PD Decls. The Plan exacerbated this complicated task because there was still no concrete information about policies and procedures to ensure safety once significant numbers of in-person proceedings commence. PD Decls.

Because of the In-person Order, to address the needs of staff who are medically vulnerable or who otherwise would not be able to return to the in-court appearances that would be required, the Public Defenders took actions that diverted and will continue to divert their resources away from their core responsibilities in the provision of public defense. PD Decls. These actions include sending supervising attorneys to cover all court appearances for cases selected that will require at least half a day in court,[18] taking them away from their typical management obligations to keep their respective organizations running, including, *inter alia*, tasks such as supervising attorneys, covering staffing and budgetary matters, and providing conflict analysis and advice. PD Decls.

## **ARGUMENT**

To prevail on this Order to Show Cause, Plaintiffs' must show "'(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping

---

[18] Part of the reason to send supervisors is to ensure equity: To protect against the possibility of putting defense attorneys with medical vulnerabilities to COVID-19 in the position of choosing between their safety and representing their client, while also ensuring that defense attorneys with those disabilities were not treated differently than defense attorneys without those disabilities, all defense attorneys were substituted for a supervisor.

decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.'" *Citigroup Glob. Markets, Inc. v. Mun. Elec. Auth. of Georgia*, No. 14-cv-2903-AKH, 2014 WL 3858509, at *2 (S.D.N.Y. June 18, 2014) (quoting *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir.2011)); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction . . . are identical."). Plaintiffs are entitled to a temporary restraining order because the Plan on its face and in practice denies people with disabilities meaningful access and fails to provide reasonable accommodations or modifications for people with disabilities; it puts litigants and the community at risk of spreading and dying from COVID-19; and it is not needed to advance legitimate government interests.

### Plaintiffs are Likely to Suffer Irreparable Harm

Defendants' policy poses irreparable harm to Plaintiffs, their clients, their employees, their missions, and the communities they serve. The risk of irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Irreparable harm is "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotation marks omitted). Importantly, "[t]he standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). Here, as explained herein and

more fully in the annexed declarations from the Public Defenders, the harm is ongoing and will continue unless the In-person Order is enjoined.

For the hundreds of Plaintiffs' clients and staff whose disabilities put them at high risk of COVID-19, the harm of infection is incalculable and irreversible. "[I]mminent risk to . . . health, safety, and lives" is the very definition of irreparable harm, *Henrietta D. v. Giuliani*, 119 F.Supp.2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), and courts in this district have repeatedly concluded that individuals with "serious underlying medical conditions . . . face a risk of severe, irreparable harm if they contract COVID-19." *E.g. Coronel v. Decker*, No. 20-cv-2472 (AJN), --- F.Supp.3d ----, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020). As, Professor Gonzalves attests, Defendants' abrupt requirement of in-person appearances presents a grave risk of transmission. *See*, Facts, *supra*. Under the In-person Order, people will be cycled through these courts, potentially being required to take public transportation, then brought into contact with others in an enclosed, congregate setting without sufficient safeguards, see LAS Decl. at ¶¶ 10-20 (explaining concerns from CrowdRx), then cycled back out again, Gonsalves Decl. ¶¶ 15-19. Especially for high-risk individuals, this forced proximity means running the risk of weeks of debilitating illness, symptoms like lung scarring that can last long past recovery, and even death. *Id.* ¶ 19. This is the very definition of irreparable harm.

The In-person Order threatens widespread harm in Plaintiffs' communities as well. When an organization challenges a policy that will cause widespread harm, the irreparable harm analysis includes the "personal and public disruption, much of which cannot be undone," to those communities and "the public at large." *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d

647, 665 (S.D.N.Y. 2019). Cycling people through courtrooms from all over the community with insufficient protection puts whole communities at risk. *Cf. United States v. Campagna*, No. 16-cr-78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (risk of cycling in and out of facilities); *Velesaca v. Decker*, No. 20 CIV. 1803 (AKH), 2020 WL 2114984, at *4 (S.D.N.Y. May 4, 2020) (describing how transportation of individuals from courts to jails and vice-versa can increase the risk of community spread of COVID-19). This is particularly harmful since Black and Latinx communities in New York City have been hardest hit by COVID-19. *See*, *supra*. Disrupting the fragile recovery of the communities that were hit hardest by COVID-19 is a harm that "cannot be remedied if a court waits until the end of trial." *Freedom Holdings*, 408 F.3d at 114.

The In-person Order also interferes with Plaintiffs' ability to represent their tens of thousands of clients, a grave harm in light of the Constitution's promise of representation for those who cannot afford it. The Second Circuit has recognized that a policy that impedes a legal service provider's "ability to carry out [their] responsibility" of representing its clients constitutes irreparable harm. *New York Civil Liberties Union v. New York City Transit Auth*., 684 F.3d 286, 295–96, 305 (2d Cir. 2012). Similarly, when legal service providers are forced to divert resources to assist clients in navigating serious risks imposed by a new policy, this constitutes irreparable harm. *Make the Rd.*, 419 F. Supp. 3d at 657-58, 665. So too here, the In-person Policy has already interfered with Plaintiffs' ability to represent their clients. *See*, *supra*. Even worse, if employees at heightened risk fall ill, both their clients and Plaintiffs could be deprived of their assistance for weeks, even months. *See*, *supra*. If a client's primary attorney must step aside because of a disability, that too impedes Plaintiffs' ability to provide effective

15

representation. *See*, *supra*. These harms to Plaintiffs and their clients' constitutional right to representation are irreparable.

Finally, Plaintiffs allege that the In-person Policy constitutes deliberate indifference and arbitrary and excessive use of government power in violation of the Fourteenth Amendment,[19] Compl. (ECF 1) ¶¶ 25-26, and "[w]hen a plaintiff alleges a deprivation of a constitutional right, the Court presumes the existence of irreparable harm." *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm" (citing cases)) (emphasis in original).

**Plaintiffs Are Likely to Succeed on the Merits of their ADA and Section 504 Claims**

Federal laws prohibiting discrimination against people with disabilities impose an "affirmative obligation to accommodate persons with disabilities in the administration of justice" and "[o]rdinary considerations of cost and convenience alone cannot justify a State's failure to provide individuals [with disabilities] with a meaningful right of access to the courts." *Tennessee v. Lane*, 541 U.S. 509, 533 (2004). Title II of the ADA and Section 504 require public entities to provide people with disabilities "the opportunity to participate in or benefit from defendants' services, programs, or activities," including through the provision of reasonable accommodations and modifications. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272, 273-274 (2d Cir. 2003) (internal quotations and citations omitted); *see also* 28 C.F.R. § 35.130(B)(1)(iii) (defining

---

[19] To obtain a temporary restraining order, the petitioner need only establish likelihood of success on the merits of one claim. *See J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738, 742 (D. Conn. 2018) (granting motion for preliminary relief because plaintiff was likely to succeed on one of four claims). While Plaintiffs respectfully submit they are likely to succeed on all claims, they have focused this petition on the disability rights claims for purposes of expediency and efficiency.

discrimination under the ADA as "[providing] a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others"). The regulations implementing both the ADA and Section 504 prohibit entities from utilizing policies, practices, criteria, or methods of administration that discriminate or have the effect of discriminating against persons with disabilities–that is, where the policies have the effect of denying meaningful and equally effective access to programs and activities. 28 C.F.R. § 35.130(b)(3), (8) (ADA), § 41.51(b)(3)(i) (Section 504). The law also requires public entities to "make reasonable modifications in policies, practices, or procedures where the modifications are necessary to avoid discrimination on the basis of disability," 28 C.F.R. § 35.130(b)(7), including "adopt[ing] and publish[ing] grievance procedures providing for prompt and equitable resolution of complaints," § 35.107(b) (ADA), § 42.505(e) (Section 504), as well as providing sufficient notice of how people with disabilities may seek such modifications, § 35.106 (ADA), § 42.505 (f) (Section 504). Finally, the regulations require that facilities not be "inaccessible to or unusable by individuals with disabilities" such they would be "excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity." 28 C.F.R. § 35.149 (ADA), § 41.56 (Section 504).

The ADA and Section 504 "seek to prevent not only intentional discrimination against people with disabilities, but also—indeed, primarily—discrimination that results from 'benign neglect.'" *Brooklyn Ctr. for Indep. of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 597 (S.D.N.Y. 2013) (quoting *Alexander v. Choate,* 469 U.S. 287, 301 (1985)). "Moreover, these laws require that a government entity do more than provide a program on equal terms to those with and without disabilities; they require 'affirmative accommodations to ensure that facially

neutral rules do not in practice discriminate against individuals with disabilities.'" *Id.* (quoting *Henrietta D.*, 331 F.3d at 275).

To make out a violation of the ADA and Section 504 of the Rehabilitation Act, a plaintiff must show that: "(1) [they are] a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) [they were] denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or [were] otherwise discriminated against by the defendant because of [their] disability." *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 196-97 (2d Cir. 2014) (internal quotation marks and footnote omitted).[20] The first two requirements are easily met here. Starting with the second, Defendants constitute public entities who are obligated to comply with these laws because they are agencies or instrumentalities of the state and they receive federal funding. 42 U.S.C. § 12131(1); 29 U.S.C. § 794(a).[21]

As to the first, people with medical conditions that make them especially vulnerable to severe illness and death from COVID-19 are qualified individuals with disabilities who are entitled to the protections of these statutes. *See Fraihat v. U.S. Immigration & Customs Enf't*, No. ED-19-cv-1546 (JGB), 2020 WL 1932570, at *26 (C.D. Cal. Apr. 20, 2020) (certifying a subclass of people with disabilities defined as "persons with health conditions putting them at risk of severe illness or death if exposed to COVID-19"); *Busby v. Bonner*, 2020 WL 3108713, at *9 (W.D. Tenn. June 10, 2020) (same).[22] Notably, even if some medical vulnerabilities to

---

[20] Courts interpret the Rehabilitation Act and the ADA interchangeably, as outside of a few "subtle distinctions" not relevant here courts will "treat claims under the two statutes identically." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citing cases).

[21] *See Budget, Fiscal Year 2019-2020*, N.Y. State Unified Court System, at xii, 5-6, http://ww2.nycourts.gov/sites/default/files/document/files/2018-11/2019-20-JUDICIARY-Budget.pdf, (New York State Court System judiciary budget, showing extensive federal assistance).

[22] Pursuant to the statutory definitions, a disability includes "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C.A. § 12102(1)(a). "Major life activities" are

COVID-19 might not in some circumstances constitute disabilities, they constitute disabilities in the context of the pandemic–when there is no vaccine, community spread is rapidly ongoing, and medical interventions are novel as well as, for many, difficult to obtain–because these conditions constrain a person's ability to engage in basic life activities until the pandemic subsides, including leaving home and going to work. *Silver v. City of Alexandria*, No. 1:20-cv-000698, 2020 WL 3639696, *4 (W.D. La. July 6, 2020) (holding that advanced age and inoperable heart disease constituted qualifying disabilities "in light of the pandemic's existence").

As to the final requirement, Defendants' In-person Order denies attorneys with disabilities and their clients with disabilities meaningful and equally effective access to and the opportunity to participate in the Defendants' services and programs. "[S]ervices, programs, or activities" is "a catch-all phrase that prohibits all discrimination by a public entity." *Noel v. New York City Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted). A public entity's failure to modify facilities or practices in order to permit meaningful access to its activities constitutes prohibited discrimination. *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 197 (2d Cir. 2014) (quoting *Alexander,* 469 U.S. at 297). Congress specifically required states to "to take reasonable measures to remove . . . barriers to accessibility" because of the   "[r]ecognition that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion . . .." *Tennessee,* 541 U.S. at 531. Indeed, in enacting the ADA, Congress was motivated in part by the fact "that many

---

defined as including, *inter alia*, "sleeping, walking, standing, . . . breathing, . . . concentrating, thinking, communicating, and working."    42 U.S.C.A. § 12102(2)(A). "The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  28 C.F.R. § 35.108(a)(2)(i).

individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities." *Id*. at 527.

As noted above, the ADA and Section 504's regulatory prohibitions against discriminatory practices and requirements for reasonable modifications forbid public entities, through action or inaction, from excluding people with disabilities, including by failing to plan for their participation or provide reasonable modifications. *See supra.* As courts have made clear, it is "not enough" for public entities to "open the door" for people with disabilities, they must also build "a ramp . . . so the door can be reached." *Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2d Cir.1982) (internal quotation marks omitted). The failure to do either constitutes a violation of the law. As set forth herein and the annexed declarations from the Public Defenders, through issuance of the In-person Order, the Defendants have created discriminatory barriers for clients with disabilities and attorneys with disabilities to access the courts and their proceedings in violation of the ADA and Section 504. Indeed, since the filing of this lawsuit, judges have repeatedly responded to requests for modifications by excusing the client or assigned attorney from an appearance that then proceeds without them. The court is, by such action, taking away the ramp and closing the door to people with disabilities and denying them meaningful access.

"[T]he demonstration that a disability makes it difficult to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for reasonable accommodation." *Henrietta D.*, 331 F.3d at 277. In *Henrietta D.*, the Second Circuit found that a class of people living with HIV and AIDS were denied meaningful access to social service benefits because the agency's policies required them to complete tasks to access benefits that were more difficult for them because of their disabilities, given their limited ability to "travel, stand in line, attend scheduled appointments, complete paper work, and otherwise negotiate

medical and social service bureaucracies." *Id.* at 278 (internal quotation marks and brackets omitted). Here, because of the timing of the In-person Order and lack of notice regarding a process for seeking accommodations or modifications to the procedures the In-person Order establishes, Defendants have effectively left clients with disabilities and attorneys with disabilities with a choice: sacrifice their right to participate in court or risk serious illness or death. Further, where clients have not had an opportunity to raise the need for modifications in advance of the appearance, or where–as has happened to the Plaintiffs' clients–a judge refuses to grant or deny the request prior to the appearance, the client also faces having a warrant issued for their arrest if they do not appear. Thus, as was true of the *Henrietta D.* plaintiffs, clients with disabilities and attorneys with disabilities face disability-based barriers to accessing courts, including the risk of serious illness or death and potential issuance of a warrant. Moreover, the mere existence of an "accommodation regime" does not satisfy the ADA and Section 504, if it is "unacceptably dysfunctional," like the Defendants' system here, and does not provide meaningful access. *Id.* at 277. Thus, methods of administering accommodations that have the effect in practice of denying people with disabilities meaningful and equally effective access, like Defendants' In-person Order, violate the ADA and the Rehabilitation Act. *See id.*; *see also State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (plaintiffs stated a claim for discriminatory methods of administration because Defendants failed to inform plaintiffs of the availability of accommodations). By forcing people with disabilities to choose between their health and participation in their cases, Defendants' In-person Order violates the ADA and Section 504.

ADA regulations also require that Title II-covered entities provide information about the existence and location of accessible services. 28 C.F.R. § 35.163(a) ("A public entity shall

ensure that interested persons . . . can obtain information as to the existence and location of accessible services, activities, and facilities"). ADA regulations further require "effective . . . communications" of necessary information to people with disabilities. 28 C.F.R. § 35.160; *see also* § 35.106, § 35.107(b). Based on these regulations, courts have found violations of the ADA where, as here, the covered entity's policies produced "an unequal opportunity to plan" by failing to provide information sufficient to allow people with disabilities to prepare in advance to access essential services on an equal footing. *See Brooklyn Ctr.*, 980 F.Supp.2d at 654 (finding the City's emergency plan violated ADA regulations on provision of information in part because the information provided by the City did not ensure that "people without disabilities are able to plan *in advance*" for how to access essential services) (emphasis in the original). In this case, OCA's lack of clear information and communication as to how the In-person Plan will accommodate the needs of people with disabilities runs afoul of the ADA's affirmative statutory and regulatory obligations.

### The Equities and Public Interest Strongly Favor a Temporary Restraining Order

The harms of the In-person Order are stark. Plaintiffs' clients and employees face severe illness, permanent medical conditions, or even death, while at the same time the policy increases the risk of COVID-19 spreading further into vulnerable communities. Meanwhile, courts can hold the appearances virtually, as they have done for months now, with no interruption of the trajectory of a case. Indeed, what Plaintiffs seek is the status quo of just a few days ago, where proceedings continued but in virtual form. Upon information and belief, since the filing of this lawsuit, the only appearances that have proceeded in person have been merely administrative. It is difficult to ascertain, under these circumstances, what legitimate government interest could be advanced by continuing the discriminatory policy that Plaintiffs challenge.

Even in normal times, "public health" is a "significant public interest." *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005). There can be little

doubt this significance is now urgent. Over the course of the pandemic, courts have found, time and again, that reducing the exposure of medically-vulnerable individuals to congregate settings and allowing them to socially distance in their homes is strongly in the public interest. *See Coronel*, 2020 WL 1487274, at *7 (public health interest in granting release of medically-vulnerable individuals from congregate setting of detention facility); *Ferreyra v. Decker*, No. 20 CIV. 3170 (AT), --- F.Supp.3d ----, 2020 WL 1989417, at *11 (S.D.N.Y. Apr. 27, 2020) (same); *Grant v. Decker*, No. 20 CIV. 2946 (AKH), 2020 WL 3402445, at *5 (S.D.N.Y. June 19, 2020) (same); *see also United States v. Scparta*, No. 18-CR-578 (AJN), --- F.Supp.3d ----, 2020 WL 1910481, at *7 (S.D.N.Y. Apr. 20, 2020) (prolonging time in congregate setting of prison risked increasing community spread). This is to avoid the increased risk of community spread and corresponding burden on hospitals that will occur when people are placed in high risk settings, especially when they have preexisting conditions that put them at greater risk. *See, e.g.*, *Coronel*, 2020 WL 1487274, at *7. The same is true here, where public health favors allowing Plaintiffs' staff and clients to socially distance at their homes, rather than forced to travel to, enter, and then return from enclosed, congregate spaces.

This interest in public health is weighty on its own, but even more so when compared to the fact that the In-person Order does not advance any public interest in criminal prosecutions. There are several reasons why. First, as Plaintiffs' declarations demonstrate, all or nearly all of the proceedings that have occurred to date are pointless exercises that have resulted in no meaningful outcome—most often merely a further adjournment of the case. BxD Decl. at ¶¶ 32-33; LAS Decl. at ¶¶ 58-69. Many of the proceedings scheduled for the weeks to come are almost certain to repeat this pattern. *Id.* Examples include six cases in Manhattan yesterday (July 15, 2020) where clients did not appear and the cases were administratively adjourned without anything being accomplished in the cases, LAS Decl at ¶ 66, and in the Bronx yesterday, where the court part adjourned for the day before the time when five of the cases were scheduled to be heard, BxD Decl. at ¶ 33.

Second, any interest Defendants proffer relating to the criminal process could be adequately addressed by the system of remote, virtual appearances that Plaintiffs and Defendants have collaborated to construct and operate over the past several months of this crisis. This is certainly the case at least until public health experts have determined that conducting in-person appearances in New York's criminal courts is safe.

Indeed, the absence of any public interest in commencing in-person proceedings prior to completing a process to ensure that courtrooms are safe belies the true purpose of the In-person Order, which, upon information and belief, is to coerce criminal defendants into accepting guilty pleas so that Defendants can assuage their concerns about a backlog in criminal cases resulting from the pandemic. The In-person Order's focus on clients who are at liberty demonstrates both a lack of concern for Plaintiffs' clients who remain incarcerated in dangerous pandemic conditions while their due process rights are suspended in limbo, as well as an intent to ensure clients who are not already incarcerated are exposed to opportunities for prosecutors to move to reconsider their bail status and compelled to consider a guilty plea to avoid burdensome and dangerous obligations to appear for pointless court proceedings.

Finally, the issuance of the TRO is further in the public interest because the In-person Plan conflicts with Executive Order 202.48, which conditions in-person criminal court appearances on the consent of the criminal defendant and reflects the Governor's determination that compelling in-person appearances absent such consent would undermine efforts to control COVID-19. N.Y. Exec. Order No. 202.48 (July 6, 2020). EO 202.48 lifted a prior emergency order's suspension of the Criminal Procedure Law (CPL), subject to some specific modifications. One of those modifications conditions the commencement of in-person proceedings on (a) the Chief Administrative Judge authorizing the commencement of in-person proceedings and (b) the consent of the parties. EO 202.48 reinstates in-person court appearances only "to the extent that . . . there is consent, in any jurisdiction where the Court has been authorized to commence in-person appearances by the Chief Administrative Judge." As an exercise of his emergency

powers, EO 202.48 reflects the Governor's determination that the personal appearances of criminal defendants absent consent "would prevent, hinder, or delay action necessary to cope with" COVID-19. This determination follows logically, since a requirement of consent enables people with disabilities that render them vulnerable to COVID-19 able to protect themselves by withholding consent to appear in person. It also ensures that in-person appearances are limited to cases in which both the prosecution and defense can see a value or purpose in appearing, so that the spread of COVID-19 is not unduly exacerbated by unnecessary court appearances.

## CONCLUSION

Wherefore, based on the reasons stated herein, and in the accompanying declarations, Plaintiffs respectfully request that this Court enter an order returning to the status quo prior to the issuance of In-person Order and further requiring Defendants' plans for in-court appearances to comply with the ADA and the Rehabilitation Act.

Dated: July 16, 2020
New York, NY

Respectfully submitted,

*/s/ Jenn R. Borchetta*
Jenn Rolnick Borchetta
Seth Packrone
Niji Jain
Thomas Scott-Railton
The Bronx Defenders
360 E. 161st Street
Bronx, New York 10451
(718) 838-7878
jborchetta@bronxdefenders.org

***Counsel to Plaintiff The Bronx Defenders***

*/s/ Corey Stoughton*
Corey Stoughton
Legal Aid Society
199 Water Street

New York, NY 10036
(646) 527 0095 (office mobile)
cstoughton@legal-aid.org

*Counsel to Plaintiff The Legal Aid Society*

/s/ *Brooke Menschel*
Brooke Menschel, Esq.
Brooklyn Defender Services
177 Livingston Street, 7th Floor
Brooklyn, NY 11201
(347) 675-3970
bmenschel@bds.org

*Counsel to Plaintiff Brooklyn Defender Services*

/s/ *Arthur J. Robb*
Arthur J. Robb
Ian-Paul A. Poulos
Clifton Budd & DeMaria, LLP
The Empire State Building
350 Fifth Avenue, 61st Floor
New York, NY 10118
212-687-7410
ajrobb@cbdm.com

*Counsel to Plaintiff Queens Law Associates Not for Profit Corporation d/b/a Queens Defenders*

/s/ *Roxanna Gutierrez*
Roxanna Gutierrez
Neighborhood Defender Service of Harlem
317 Malcolm X Boulevard, 10th Floor
New York, NY 10027
(212) 876 5500 (office)
(917) 297 8604 (office mobile)
rgutierrez@ndsny.org

*Counsel to Plaintiff Neighborhood Defender Service of Harlem*

_/s/ Patrick Joyce_
Patrick Joyce, Esq.
70 Lafayette Street- 2d Floor
New York, NY 10013
(212) 285-2299
patrickjoyce.esq@gmail.com

**_Counsel to Plaintiff New York County Defender_**