UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------   X

THE BRONX DEFENDERS, THE LEGAL AID
SOCIETY, BROOKLYN DEFENDER SERVICES,
QUEENS LAW ASSOCIATES NOT FOR PROFIT
CORPORATION d/b/a QUEENS DEFENDERS,          Civil Action No.
NEIGHBORHOOD DEFENDER SERVICE OF             1:20-cv-5420 (ALC)
HARLEM, and NEW YORK COUNTY DEFENDER
SERVICE,

                                    Plaintiffs,

-against-

THE OFFICE OF COURT ADMINISTRATION, and
LAWRENCE K. MARKS, in his official capacity as Chief
Administrative Judge of the Unified Court System,

                                    Defendants.

----------------------------------------------------------------------   X


# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENJOIN IN-PERSON APPEARANCES IN NYC CRIMINAL COURT

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Lawrence K. Marks,
Chief Administrative Judge
Adrienne J. Kerwin
Assistant Attorney General
(pro hac application pending)


EILEEN D. MILLET
Counsel, Office of Court Administration
Elizabeth A. Forman and Anthony Perri,
Deputy Counsel, of Counsel

## Table of Contents

Table of Authorities ....................................................................................................... ii

Preliminary Statement. ....................................................**Error! Bookmark not defined.**

Statement of Facts...........................................................**Error! Bookmark not defined.**

    A.    The Effect of The Pandemic on the New York City Criminal Court .....**Error! Bookmark not defined.**

    B.    New York's Limited First Steps Towards In-Person Appearances in the Criminal Court ...................................................................................................**Error! Bookmark not defined.**

    C.    Partnering with Plaintiffs and All Stakeholders For the Resumption of In-Person Proceedings...................................................................**Error! Bookmark not defined.**

    D.    Implementing The Criminal Court Return Plan ...............**Error! Bookmark not defined.**

    E.    Going Forward...............................................................**Error! Bookmark not defined.**

Argument.......................................................................**Error! Bookmark not defined.**

    POINT I: THIS COURT MUST ABSTAIN BECAUSE THIS SUIT SEEKS RELIEF ENJOINING, AUDITING AND SUPERVISING CURRENT, ONGOING STATE CRIMINAL PROCEEDINGS AND PROCEDURES ............................................................ 11

    POINT II: PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING THEIR ENTITLEMENT TO AN ORDER ENJOINING ALL COURT APPEARANCES IN NEW YORK CITY CRIMINAL COURT..........................................**Error! Bookmark not defined.**

    A.    Plaintiffs Fail To Establish That Irreparable Harm Is Imminent If Preliminary Injunctive Relief Is Not Granted ...................................................**Error! Bookmark not defined.**

    B.    Plaintiffs Are Not Likely to Succeed on The Merits of Their Claims ..**Error! Bookmark not defined.**

    C.    The Balancing of Hardships and the Public Interest Favors the Limited Re-Opening Of Criminal Court. ...........................................................**Error! Bookmark not defined.**

Conclusion...................................................................**Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

CASES                                                                                               PAGE(S)

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999)..................................................................................................................24

*Barrett v. Harwood,*
    967 F. Supp. 744 (N.D.N.Y. 1997)........................................................................................20

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999)..................................................................................................15

*Bergamaschi v. Cuomo,*
    2020 WL 1910754 (S.D.N.Y. April 20, 2020).......................................................................24

*Bilenker v. Broadridge Fin. Solutions,*
    2018 2018 WL 6031159 (E.D.N.Y. Nov. 16, 2018)..............................................................16

*Brennan Center for Justice v. U.S. Dept of Justice,*
    2018 WL 637424 (S.D.N.Y. Sept. 31, 2018) ........................................................................18

*Caldwell Mfg. Co. North America, LLC v. Amesbury Group, Inc.,*
    2011 WL 3555833 (W.D.N.Y. Aug. 11, 2011)......................................................................16

*Charles v. Orange Cty.,*
    925 F.3d 73 (2d Cir. 2019) ....................................................................................................24

*Collins v. Harker Heights,*
    503 U.S. 115 (1992)..........................................................................................................24, 25

*Colorado Water Conserv. Dist. v. United States,*
    424 U.S. 800, 816 (1976) ......................................................................................................11

*Coronel v. Decker,*
    2020 WL 1487274 (S.D.N.Y. March 27, 2020).....................................................................25

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998)................................................................................................................25

*Cunney v. Bd. of Trs. of Grand View,*
    660 F.3d 612 (2d Cir. 2011) ..................................................................................................24

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,*
    804 F.3d 178 (2d Cir. 2015) ..................................................................................................22

*Dessaint v. Lignel,*
    584 F. App'x 30 (2d Cir. 2014)..............................................................................................23

*Diamond "D" Constr. Corp. v. McGowan*,
  282 F.3d 191 (2d Cir. 2002) ..................................................................................11

*Disability Rights v. New York*,
  916 F.3d 129 (2d Cir. 2018) ..................................................................12, 13, 14, 15

*Doe v. New York University*,
  666 F.2d 761 (2d Cir. 1981) ..................................................................................15

Dorey v. Nat'l Union Fire Ins. Co., 934
  F.2d 30 (2d Cir. 1991) ..........................................................................................16

*Falco v. Justices of the Matrimonial Parts of the Sup. Ct. of Suffolk Cty.*,
  805 F.3d 425 (2d Cir. 2015) ..................................................................................12

*Fishman v. Office of Court Admin.*,
  2020 WL 1082560 (S.D.N.Y. Mar. 5, 2020) .........................................................13

*Galvin v. New York Racing Ass'n*,
  70 F. Supp. 2d 163 (E.D.N.Y. 1998) ....................................................................20

*Hansel v. Town Court of Springfield*,
  56 F.3d 391 (2d Cir. 1995) ....................................................................................11

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir.2003) ...................................................................................22

*Jayaraj v. Scappini*,
  66 F.3d 36 (2d Cir. 1995) ......................................................................................16

*Johnson v. Doe*,
  2001 U.S. Dist. LEXIS 366 (S.D.N.Y. Jan. 16, 2001) ..........................................16

*Kaufman v. Kaye*,
  466 F.3d 83 (2d Cir. 2006) ..............................................................................13, 14, 15

Kowalski v. Tesmer,
  543 U.S. 125 (2004) ...............................................................................................21

*L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. N.Y.*,
  2018 WL 2390125(E.D.N.Y. May 25, 2018) .........................................................15

*Make the Rd. New York v. Cuccinelli*,
  419 F.Supp.3d 647 (S.D.N.Y. 2019) .....................................................................19

*Martinez v. Cuomo*,
  2020 WL 2393285 (S.D.N.Y. May 12, 2020) ........................................................22

*McElwee v. County of Orange,*
   700 F.3d 635 ...................................................................................................................22

Mental Hygiene Legal Servs. v. Cuomo,
   13 F. Supp.3d 289 (S.D.N.Y. 2014).............................................................................21

*Middlesex County Ethics Committee v. Garden State Bar Assoc.,*
   457 U.S. 423 (1982): (i) ................................................................................................12

*Monterosa v. Decker,*
   2020 WL 1847771(S.D.N.Y. April 11, 2020) ...............................................................18

*New York v. Actavis PLC,*
   787 F.3d 638 (2d Cir. 2015) .........................................................................................15

*Nken v. Holder,*
   556 U.S. 418 (2009) ...............................................................................................15, 25

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ...............................................................1, 11, 12, 13, 14, 15

*Parkway Hosp. v. Shah,*
   460 F. App'x 21 (2d Cir. 2012).....................................................................................23

*Philips, Nizer, Benjamin, Krim, & Ballon v. Rosentiel,*
   490 F.2d 509 (2d Cir. 1973) .........................................................................................13

*Powell v. Nat'l Bd. of Med. Exam'rs,*
   364 F.3d 79 (2d Cir. 2004) ...........................................................................................22

*Quackenbush v. Allstate Ins. Co.,*
   517 U.S. 706 (1996)......................................................................................................12

*Rodriguez by Rodriguez v. DeBuono,*
   175 F.3d 227 (2d Cir. 1998) .........................................................................................16

*Samuels v. Mackell,*
   401 U.S. 66 (1971)........................................................................................................11

*Scaccia v. Stamp,*
   700 F. Supp. 2d 219 (N.D.N.Y. 2010) .........................................................................24

*SEC v. Platinum Mgmt. (NY) LLC,*
   2017 WL 2915365 (E.D.N.Y. July 7, 2017).............................................................14, 25

*SEC v. Shkreli,*
   2016 WL 1122029 (E.D.N.Y. Mar. 22, 2016) .........................................................25, 26

iv

*Sprint Comm'ns, Inc. v. Jacobs,*
    134 S. Ct. 584 (2013) .................................................................................................... 11, 12

*Tenet v. Doe,*
    544 U.S. 1 (2005) ................................................................................................................ 11

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ........................................................................................................... 22

*United States v. Heimann,*
    U.S. Dist. LEXIS 11990 (S.D.N.Y. 1982) ....................................................................... 25

*United States v. Blackburn,*
    461 F.3d 259 (2d Cir. 2006) .............................................................................................. 23

*Utica Mut. Ins. Co. v. INA Reinsurance Co.,*
    2012 WL 12874471(N.D.N.Y. Nov. 6, 2012) .................................................................. 16

*Wallace v. Kern,*
    481 F.2d 621 (2d Cir. 1973) .......................................................................................... 13, 15

*Wallace v. Kern,*
    499 F.2d 1345 (2d Cir. 1974) ........................................................................................ 13, 15

*Wallace v. Kern,*
    520 F.2d 400 (2d Cir. 1975) ......................................................................................... 13, 15

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ............................................................................................................... 15

*Ying Jing Gan v. City of New York,*
    996 F.2d 522 (1993) ........................................................................................................... 25

*Younger v. Harris,*
    401 U.S. 37 (1971) ..................................................................................................... 11, 12, 13

## FEDERAL STATUTES

Americans With Disabilities Act
    42 U.S.C. § 12101, *et seq.* ....................................................................................... passim

§ 504 of the Rehabilitation Act of 1973
    29 U.S.C. § 794 ......................................................................................................... passim

Defendants Office of Court Administration ("OCA") and the Chief Administrative Judge of New York State, Lawrence K. Marks, (collectively, "Defendants"), jointly submit this memorandum of law, with the accompanying declarations ("Decl.") of Tamiko Amaker and Justin Barry, both dated July 20, 2020, in opposition to Plaintiffs' motion for a preliminary injunction halting any and all in-person court appearances in New York City Criminal Court.

### Preliminary Statement.

After a shutdown to all but virtual appearances, New York State's criminal courts, like this federal court, are now beginning to reintroduce certain, limited in-person appearances. As New York City entered Phase III of the State's phased-in, regional reopening plan, the New York City Criminal Court ("Criminal Court") scheduled a limited number of in-person appearances, beginning on July 15, constituting only ten appearances per courthouse[1] per day. These appearances are subject to full safety protocols implemented in each relevant courthouse. In addition, Judge Amaker, the Administrative Judge of the Criminal Court, is taking measures to improve the timing of notification of appearances about which Plaintiffs primarily complain in this motion. The present motion, in which Plaintiffs seek to enjoin all in-person appearances in Criminal Court until they decide they are prepared to return to such proceedings, is thus entirely unnecessary. It is also legally baseless.

First, the injunction sought against state criminal processes is not one which a federal court may properly issue. The conduct of criminal proceedings is an essential sovereign function of the states. It is well established that a claim for declaratory and injunctive relief which places a federal court in the position of having to conduct a "continuing audit" of the ongoing procedures under which criminal processes take place should not be entertained by the federal courts. O'Shea v. Littleton, 414 U.S. 488 (1974). This case involves exactly such a claim for relief. The Complaint and

---

[1] These appearances are occurring in one courthouse in each borough.

this motion seek declaratory and equitable relief enjoining all in-person appearances, and thereby would require the Court to determine the conditions and timing under which New York State may open its criminal courts to personal appearances. This is improper and alone justifies denial of Plaintiffs' motion.

Second, Plaintiffs have not demonstrated any irreparable injury, or any of the other requirements justifying the entry of a preliminary injunction. Rather, at base, their only factual claim is that their offices have been significantly inconvenienced by the reopening of the criminal courts. This is not the same thing as the imminent irreparable injury. Moreover, Plaintiff's fears about their attorneys' or clients' health also are not, without more, irreparable injury. Plaintiffs offer no evidence that a total of ten scheduled in-person appearances a day, in each City borough in which the Criminal Court operates, subject to full safety protocols, is sufficient to establish, as a factual matter, "imminent" irreparable injury to any attorney or client.

Nor have Plaintiffs demonstrated a likelihood of success on the merits. Plaintiffs have attempted to dress this suit in the guise of a Title II and Rehabilitation Act claim for failure to provide a reasonable accommodation for disabled individuals. However, nothing in the declarations submitted by Plaintiffs demonstrates any denial of access to the courts to the Plaintiffs or their clients. To the contrary, the accommodations provided, which allow virtual appearances and adjournments, as well as substitution of counsel from the Plaintiff organization, whenever an individual self-identifies as being at high-risk from COVID-19, are reasonable. And in any event, Plaintiffs' main complaint, which relates to insufficient advance notice of the current Plan, and of individual appearances, has already been addressed. Plaintiff's Fourteenth Amendment substantive due process claim is not even argued to provide any basis for an injunction, and, in any event, fails to set out a valid cause of action.

Any thoughtful application of the balancing of hardship test underscores the lack of merit to Plaintiffs' effort to avoid all in-court appearances. Plaintiffs argue that claims of inconvenience, and

their subjective and objective fears, outweigh the interest of the public in a functioning criminal justice system.  But such administrative inconvenience, even accompanied by the fear and concerns that we all experience in the face of the current pandemic, should not outweigh the overwhelming societal interest in an effective, fully functioning, court system.  That system, at this juncture, properly should include a combination of virtual appearances and in-person proceedings (accompanied by full safety protocols). The motion must therefore be denied.

S<small>tatement of</small> F<small>acts</small>

### A.  The Effect of The Pandemic on the New York City Criminal Court

The Criminal Court is a single citywide court, part of New York's Unified Court System ("USC"), with primary jurisdiction over misdemeanors and violations, and restricted jurisdiction over felonies—limited to arraignments and preliminary hearings—within the City of New York.  Amaker Decl. ¶ 2.  On March 16, 2020, in response to the rapid escalation of the COVID-19 crisis, and in accordance with the emergency public health directives issued by the Governor, New York State's Chief Judge, Janet DiFiore, and Chief Administrative Judge Lawrence K. Marks restricted all court operations statewide to "essential" matters only.  Id. ¶ 8.  No in-person appearances were permitted. Id.  All other matters regarding defendants not held in custody were administratively adjourned.  Id. None of those defendants, or others who have remained at liberty since their arrest, have had an in-person court appearances since their arraignment or release from custody, which may have occurred months ago.  Id.

Although appropriate at the time, restricting the Criminal Court to virtual proceedings has limited some critical criminal justice functions regarding these non-custodial defendants—including (1) issuing or modifying, and serving on defendants, orders of protection; (2) monitoring non-custodial pre-trial conditions of release; (3) reviewing custody status generally; and (4) conferencing matters.  Id. ¶ 9.  The pandemic's disruption of the criminal justice system has resulted in a backlog of 39,000 cases

3

citywide, which encompasses nearly 12,000 unindicted felonies. Id. This represents approximately a 33% increase in pending matters and a 42% increase in unindicted felonies over only a four-and-a-half-month period.  Id. ¶ 9.

The increasing backlog of cases, along with other factors, such as a mounting concern for public safety, has caused public officials to call for "reopening" of the criminal justice system, despite the fact that it was never "closed," but was instead limited to virtual appearances.  See, e.g., https://qns.com/story/2020/07/17/de-blasio-begs-courts-to-reopen-as-fully-as-humanly-possible/.

Indeed, the federal courts for the Southern District of New York have similarly begun to schedule and require in-person proceedings, and have required parties who preferred not to be present in-person to nonetheless attend. See https://www.nysd.uscourts.gov/sites/default/files/2020-07/Southern%20District%20of%20New%20York%20Reopening.pdf  (Southern District announces reopening of its courthouses, under its Phased Re-Entry Plan to the public with business there on July 6, 2020); https://nypost.com/2020/07/20/disgraced-ex-assembly-speaker-sheldon-silver-to-be-sentenced-monday/?utm_campaign=iphone_nyp (article recounting holding of Judge Caproni that Sheldon Silver was required to appear for sentencing in person: "The Courthouse has reopened to the public and implemented screening at entry, mask and social-distancing requirements, and sanitation protocols, among other precautions. . . This Court is currently holding in-person proceedings where those measures are all observed. Accordingly, it is the Court's preference to conduct Mr. Silver's re-sentencing at the Courthouse.") (all last accessed July 20, 2020).

## B. New York's Limited First Steps Towards In-Person Appearances in the Criminal Court

New York State has begun to resume business and government operations, consistent with the metrics and phased-in operations decreed by the Governor. Amaker Decl. ¶ 10. UCS has thus developed a phased plan for resumption of specific aspects of its operations.  Id.  UCS's phase plan for its operations is publicly available on its website at  https://www.nycourts.gov/limited-

4

filings.shtml , and annexed to the Amaker Decl. as Exhibit 2. (the "UCS Plan").

New York City entered the State's Phase III on July 6, 2020. Amaker Decl. ¶ 15. Accordingly, pursuant to the UCS Plan, courts within New York City were to expand their operations to include: (1) in-court conferences of felony cases for defendants at liberty; (2) arraignments of defendants who have been issued desk appearance tickets; and (3) selected plea and sentencing proceedings for defendants at liberty. Id. Ex. 2.

The plan for the return of in-person operations in the Criminal Court (the "Return Plan"), dated July 9, 2020, drafted by Judge Amaker, establishes a phased reopening of the Criminal Court. Amaker Decl. Ex. 1. Each phase of the Return Plan has been implemented as the New York City Region achieved the requisite metrics for each phase of reopening. Id. ¶ 10.

In May, courts outside of New York City progressed through the phased reintroduction of in-person appearances in response to the State's general progress in controlling the pandemic as tracked by the Governor's COVID-19 metrics. Id. ¶ 11. Accordingly, Judge Amaker, and the Criminal Court's Chief Clerk, Justin Barry, notified Plaintiffs in May of the impending necessary reintroduction of in-person appearances inside of New York City as New York City entered Phase I on June 8, 2020 and Phase II on June 22, 2020. Amaker Decl. Ex. 3 (Supplemental Criminal Court Return Plan dated July 9, 2020). Barry Decl. ¶ 22.

### C. Partnering with Plaintiffs and All Stakeholders For the Resumption of In-Person Proceedings

Throughout the current crisis, OCA's staff has met many times with the Plaintiffs and other interested parties, fielded innumerable questions and phone calls, and responded to hundreds of emails. Amaker Decl. ¶¶ 10, 11, 14; Barry Decl. ¶¶ 17-19. In light of the difficulties and fears raised by these unprecedented circumstances, OCA has attempted to build consensus. Even before New York City entered Phase I, in anticipation of the need to later begin scheduling in-person appearances, OCA invited Plaintiffs to participate in a discussion and walk-throughs of its Criminal Court

courthouses on June 3, 2020 (Richmond County); June 5, 2020 (New York County); June 8, 2020 (Kings County); June 9, 2020 (Bronx County); and June 10, 2020 (Queens County).  Amaker Decl. ¶ 12. Although other stakeholders attended, Plaintiffs declined to participate in these discussions and walk-throughs. Id.; Barry Decl. ¶ 20.

Later, at Plaintiffs' request, OCA offered three additional walk throughs of Criminal Court facilities: in two counties on one date, June 24, 2020 (Kings and New York Counties) and June 25, 2020 (Bronx County). Amaker Decl. ¶ 13; Barry Decl. ¶ 22.  These rescheduled walkthroughs allowed Plaintiffs' recently-retained epidemiological consultant, CrowdRx, to attend. Amaker Decl. ¶ 13; Barry Decl. ¶ 22.  At these walk-throughs and in separate discussions with Plaintiffs, Judge Amaker discussed ongoing plans for resumption of in-person operations, including in-person court appearances, and answered any questions Plaintiffs and their consultant posed. Amaker Decl. 14.

### D.  Implementing The Criminal Court Return Plan

#### 1.  Safety Measures In Place in the Criminal Court

As knowledge about COVID-19 has increased, and government guidance has evolved, UCS and the Criminal Court have established protocols and procedures in order to ensure the safety of all judges, personnel, and visitors to the courts.  Barry Decl. ¶ 3.  These protocols have been based on the best guidance available from the Centers for Disease Control and the New York State Department of Health.  Id. & Exs. A-G. They were created based on the input, and approved by, a consultant hired by UCS, Dr. Amira Roess.  Id. ¶ 3. Her background and qualifications can be viewed at https://mei.edu/experts/amira-roess.  Dr. Roess has also been retained by this Court—the United States District Court for the Southern District of New York—as an expert consultant for its reopening.

The Criminal Courts' safety protocols and practices adhere to the UCS protocols.  Barry Decl. ¶¶ 6-7.  Current practices include: restrictions on persons who self-identify as at risk of having or

having been exposed to COVID-19 ("at risk") from entering court facilities; procedures when a courthouse visitor self-identifies as a person at risk; a process for handling mandatory court appearances by persons who self-identify as at risk; procedures when court staff self-identify as at risk; notification procedures upon receipt of a confirmed coronavirus diagnosis of a courthouse visitor or staff; requirements of the use of face masks, hand sanitizer, gloves and social distancing; marking of social distancing in courthouses; use of face shields; installation of plexiglass screens and barriers; disposal of PPE; limitations on business travel for court employees; procedures for receipt of mail and packages; requirements for hygiene and cleaning of workstations, and cleaning of facilities; placement of recommended signage; COVID-19 testing of employees; temperature-taking and questioning of all courthouse visitors; and daily temperature-taking and self-assessment of judges and non-judicial personnel.  Id. ¶ 8.

In addition, pursuant to the courts' contracts for cleaning and maintenance with New York City (which owns the buildings), the portion of the buildings to be used have appropriate ventilation, cleaning, and other maintenance.  Barry Decl. ¶ 21 & Exs. H-J.  Also, as part of its response to the public health crisis, an enhanced cleaning protocol and schedule has been implemented in the Criminal Court, which includes such items as: cleaning, sanitizing, and stocking the restrooms up to four times daily; wiping down high touch surfaces in public areas, e.g. doorknobs, elevator buttons, handrails, countertops, up to four times daily; and cleaning and sanitizing high touch surfaces in common areas, e.g. meeting room tables, kitchen counter tops, daily.  Id. ¶ 15.  Copies of public documents relating to these protocols are annexed to the Barry Decl. as Exs. H-J.  A member of the custodial staff for the building is also stationed in each of the Criminal Court's in-person appearance courtrooms during the hours of operation to clean and wipe down surfaces in between each court appearance.  Id. ¶ 16.

### 2.  Calendaring Ten Cases Per Courthouse Per Day

As part of the initial implementation of Phase III of the Return Plan, a small number of

cases—not to exceed ten per borough per day—was scheduled for in-person appearances in Criminal Court starting July 15, 2020. Amaker Decl. ¶ 16. The cases were calendared for a time certain and staggered. Id. Only one courtroom in each borough's courthouse was at use for scheduled appearances. Barry Decl. ¶ 21. The matters were heard only in courtrooms specially retrofitted to ensure that all necessary health and safety protocols were maintained, and common areas necessary to access those courtrooms were also similarly retrofitted. Amaker Decl. ¶ 16. Social distancing markers were in place, increased sanitization and cleaning regimens had already been instituted, and plexiglass had been installed where appropriate. Id. Personal protective equipment (masks and/or face shields) was mandated and supplied, as needed, for all judges, staff, and court participants, and a screening of all courthouse entrants, including digital temperature taking, and individual questioning, was implemented.  Id.

### 3.  Protocol for Choosing Cases for In-Person Appearances

Consistent with the UCS Plan, as part of the Criminal Court Return Plan, each supervising judge was instructed to select cases for an in-person appearances that involved the most serious unindicted felony matters where there was a bail-eligible offense charged or recidivist defendants with multiple open matters.  Amaker Decl. ¶ 17.  They were also instructed to prioritize those cases with civilian victims.  Id.  Nearly all these matters were already calendered for conferences on the date appearances were then orderedId.

These matters are a priority for the Criminal Court because they involve defendants who had been at liberty for months without their cases advancing. Id. ¶ 18.  The cases scheduled for the first three days of in-person appearances included matters involving rape, serious felony assaults, child endangerment, lifetime parolees, and contempt arrests for violations of orders of protection.  Id.

The defendants were notified via the Criminal Justice Administration, through telephone calls, emails, and/or text messaging, that an in-person appearance was required for their already scheduled

court date.  Defense counsel, including Plaintiffs, were notified by email.  Id. ¶ 19.  All notices went out at least forty-eight hours ahead of any court appearance.  Id.  Thirty cases were scheduled for July 15 across all five boroughs. Thirty-six were scheduled for July 16, and twenty-seven for July 17.  Id.

### 4. Requests for Accommodations for Stated COVID-19- Risk Factors

The judges of the Criminal Court were instructed, on request, to grant a defendant an accommodations due to COVID-19-related risk-factors, or other related circumstances (such as fears for elderly family members), including allowing a virtual appearance or granting an adjournment. Id. ¶ 20.  No medical evidence or other proof of such factors was to be required.  Id.[2]  An in-person appearance by a specific defense counsel was similarly not to be required when COVID-19-related, risk-factors, or other circumstances necessitated an appropriate accommodation, which could include a substitute appearance by an attorney associated with the same firm or defender organization, a virtual appearance, or an adjournment, within the individual judge's discretion under the circumstances.  Id. The supervising judges were also instructed that a warrant was not to be issued if a defendant failed to appear (save for exceptional circumstances, such as a significant public danger), and, instead, a second notification should be sent out for a subsequent court date.  Id.

Thus, for defense counsel appearances on each of the above-listed dates, Plaintiffs were permitted to substitute any associated attorney within their respective organizations.  Id. ¶ 24.  Having associated attorneys cover Criminal Court appearances of this nature has long been common practice among Plaintiffs, who are large organizations employing many attorneys.  Id.

Any deviation from the time-certain staggered scheduling that was set for cases scheduled for

---

[2] The COVID FAQs on the ADA page of the UCS, explain that applications for such accommodations may be addressed, and will be decided by, the individual judge on the matter. ww2.nycourts.gov/sites/default/files/document/files/202006/ADA%20COVID%2019%20FAQs %202020_0.pdf (UCS website indicating that requests for accommodations relating to COVID-19 may be directed to the individual judge) (last accessed July 20, 2020).

July 15 through 17, 2020 occurred because a defendant's appearance had been excused and all parties were otherwise present and able to proceed.  Id. ¶ 27.  In no instance, did this deviation cause an increase in personnel present or actual foot traffic in the given courtroom.  Id.

### 5.  The Scheduled Criminal Court Appearances Result in Resolution

The scheduling of matters for in-person appearances resulted in a significant number of resolutions of the matters.  As set out above, on July 15, 2020, thirty cases were scheduled across all five boroughs.  Id. ¶ 21. The resolution rate during these first three days—in excess of twenty percent—has far exceeded the rate achieved by means of virtual conferencing prior to Phase III.  Id. ¶ 25.  It is OCA's understanding that, consistent with its judges' prior experiences, this higher rate of disposition resulted from the scheduled appearance, and the preparations to bring parties together in-person before the Court.  Id. Indeed, on multiple occasions, during the current crisis, and in particular more recently, Plaintiffs themselves have requested in-person appearances on specific matters.  Id. ¶ 26.

### E.  Going Forward

It should be stressed that there is no approved plan presently in the Criminal Court to increase the number of in-person appearances beyond the ten-case per courthouse cap as New York enters Phase IV.  Id. ¶ 29.  Any such formal plans will be made public at least two weeks before the date of their implementation.  Id.  In addition, based on the Criminal Court's experiences last week, and feedback received, OCA plans on providing notice of at least a week before any matter will be scheduled for an in-person appearance.  Id., ¶ 28.  As described above, and in the accompanying declarations, Judge Amaker, along with the Criminal Court's administrative staff, and OCA, have made every effort to assist Plaintiffs, to involve them in the court's plans, and address their concerns.

## Argument

## POINT I: THIS COURT MUST ABSTAIN BECAUSE THIS SUIT SEEKS RELIEF ENJOINING, AUDITING AND SUPERVISING CURRENT, ONGOING STATE CRIMINAL

## PROCEEDINGS AND PROCEDURES

This matter, including Plaintiff's application for an injunction, is barred under the abstention doctrine derived from Younger v. Harris, 401 U.S. 37 (1971) and O'Shea v. Littleton, 414 U.S. 488. Younger prohibits a federal court from enjoining, as well as from otherwise interfering with, ongoing state criminal matters and procedures.  The Younger abstention doctrine is an exception to the general "unflagging" obligation of federal courts to take jurisdiction of matters before them. "[W]hen Younger applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter." Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 197-98 (2d Cir. 2002) (citing Colorado Water Conserv. Dist. v. United States, 424 U.S. 800, 816 n.22 (1976)). The Supreme Court has further noted that whether a federal court should abstain under Younger is a "threshold question" that may be resolved even before addressing Article III jurisdiction.  Tenet v. Doe, 544 U.S. 1, 6 n.4 (2005).

The Younger abstention doctrine "exemplifies one class of cases in which federal court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 588 (2013) ("Sprint").  The need for federal abstention in such circumstances "was 'reinforced' by the notion of 'comity, that is, a proper respect for state functions.'" Id. (quoting Younger, 401 U.S. at 44).  Younger abstention thus applies not just to requests to enjoin specific state proceedings, but also to requests for declaratory relief that would tend to affect or interfere with ongoing state proceedings. Hansel v. Town Court of Springfield, 56 F.3d 391, 393 (2d Cir. 1995) (citing Samuels v. Mackell, 401 U.S. 66 (1971).  Younger instructs federal courts to avoid intervention in state processes that would increase friction between the state and federal systems and encroach unnecessarily on an area of policy

assigned to the state.  See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-19 (1996).[3]

Younger's principles of "equity, comity, and federalism" also require abstention from matters seeking declaratory or injunctive relief when such relief opens the door to a "federal audit of state criminal proceedings." O'Shea v. Littleton, 414 U.S. 488, 500 (1974). In O'Shea, the plaintiffs sought to enjoin state court judges from carrying out allegedly unconstitutional policies relating to setting bond, sentencing, and jury fees in criminal cases. Id. at 491-92.  The Court reasoned that "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials" would amount to "nothing less than an ongoing federal audit of state. . . proceedings which would indirectly accomplish the kind of interference that [Younger] and related cases sought to present." Id. at 500.

The recent Second Circuit case of Disability Rights v. New York, 916 F.3d 129 (2d Cir. 2018) ("DRA"), is virtually in all points similar with the current action. It addresses a suit seeking declaratory and injunctive relief against the New York State courts based on alleged violations of Title II of the Americans with Disabilities Act (ADA Title II) and § 504 of the Rehabilitation Act of 1973 (Rehab Act). Id. at 130-32. In particular, the plaintiff, just like Plaintiffs here, sought a declaration that certain state court policies and procedures (in that case

---

[3] Under Younger, district courts must abstain from exercising jurisdiction when the declaratory or injunctive relief sought in the matter interferes with: (1) "ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings," or (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint 134 S. Ct. 584, 591 (2013) (internal quotation marks and citation omitted).  In addition, although these factors are not dispositive, courts may, in guiding their decision, consider the three factors derived from Middlesex County Ethics Committee v. Garden State Bar Assoc., 457 U.S. 423 (1982):  (i) whether there is an ongoing state proceeding; (ii) whether the state proceeding implicates important state interests; and (iii) whether the state proceeding provides an adequate opportunity to raise federal challenges.  Id. See Falco v. Justices of the Matrimonial Parts of the Sup. Ct. of Suffolk Cty., 805 F.3d 425, 427 (2d Cir. 2015) (Middlesex factors may be used but are not dispositive after Sprint).

in the family courts) violated the federal law, as well as concomitant equitable relief imposing conditions relating to notice and other procedural issues. Id. at 132. The Second Circuit held that it was required to abstain, reasoning that, as in O'Shea, plaintiffs' desired declaratory and/or injunctive relief would permit a "continuing, impermissible 'audit'" of the state court's ongoing proceedings, which "offend[s] the principles of comity and federalism." Id. at 136.[4] See also Kaufman v. Kaye, 466 F.3d 83, 86 (2d Cir. 2006) (abstention was required from matter challenging state court judicial assignment procedures which had applied to plaintiff); Fishman v. Office of Court Admin., No. 18–CV–282 (KMK), 2020 WL 1082560, at *10 (S.D.N.Y. Mar. 5, 2020) (abstention was mandatory in ADA/Rehabilitation Act action challenging state court procedures); Falco., 805 F.3d 425, 427 (abstention required from decision of constitutional challenge to statute relating to payment of attorney's fees in court proceedings, when state court had ordered payment of such fees, was warranted because plaintiff's "federal lawsuit [seeking to invalidate the fee payment statute] implicates the way New York courts manage their own divorce and custody proceedings—a subject in which 'the states have an especially strong interest.'" (quoting Philips, Nizer, Benjamin, Krim, & Ballon v. Rosentiel, 490 F.2d 509, 516 (2d Cir. 1973)).

And in Wallace v. Kern, 481 F.2d 621, 622 (2d Cir. 1973), Wallace v. Kern, 499 F.2d 1345, 1351 (2d Cir. 1974) and Wallace v. Kern, 520 F.2d 400, 405 (2d Cir. 1975), which were extensively

---

[4] In DRA, the court did not reach the question of whether the related third type of abstention under Younger—where the relief sought would improperly interfere in core and essential state court functions—applied, holding that O'Shea's application was sufficient to bar the action. Id. at 135 ("[W]e do not decide whether this case fits within the third Younger category [as the district court did], for we conclude that it falls squarely within O'Shea's abstention framework."). Similarly here, although abstention here would also be proper under the third prong of Younger—because when and how in-person appearances may occur is an essential functions of any criminal court—there is no need for this Court to reach this issue.

discussed in <u>Kaye</u>, applying principles of comity, the Second Circuit reversed and vacated the district court's orders reviewing and enjoining state criminal court processes because those orders improperly interfered with, among other things, state scheduling of pro se criminal defendants, procedures for setting bail, and assignment of counsel. <u>See also</u> <u>DRA</u>, 916 F. 3d 120, 135 (discussing additional cases in other circuits applying <u>O'Shea</u> to criminal matters).

In addition, the Second Circuit has made clear that plaintiffs cannot avoid the application of the comity doctrine recognized in <u>O'Shea</u> by arguing that all they seek is a declaration relating to certain state judicial procedures, and unspecified equitable relief. In <u>Kaufman v. Kaye</u>, 466 F.3d 83, the plaintiff filed a federal suit seeking, among other things: (i) a declaration that the system for assigning cases among panels of judges in New York's Appellate Division violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (ii) an accompanying mandatory injunction requiring the state to establish some new system of assigning appeals in that court. 466 F.3d at 85. Affirming the district court's dismissal of the action, the Second Circuit held abstention was required because the declaratory and injunctive relief sought "would be . . . intrusive in the administration of the New York court system." <u>Id.</u> at 86 (citing <u>O'Shea</u> 414 U.S. 488, 500). In addition, the Court expressly held that that the fact that the plaintiff, like the Plaintiffs here, had not actually specified the equitable relief he sought did not change the analysis. <u>Id.</u> at 87.

The present case, including the current injunction motion, requires abstention pursuant to <u>O'Shea</u>. The operation by a state of its criminal justice system is a paramount matter of state concern. <u>SEC v. Platinum Mgmt. (NY) LLC</u>, 2017 WL 2915365, *6  (E.D.N.Y. July 7, 2017) ("the effective enforcement of the criminal law is [of] paramount public concern"). It is hard to imagine anything more intrusive on state processes and sovereignty than an order informing the criminal courts and judges that they cannot now schedule even ten in-person criminal appearances a day in a courthouse with full COVID-19 protocols in place.  Moreover, the declaration and/or equitable relief sought by

14

Plaintiffs in the Complaint would, just as in <u>Kaufman</u>, place the federal court in the role of monitoring the state criminal court, and telling it what it can and cannot do to address the need to advance the criminal proceedings before it and protect public health and safety. This is exactly what is forbidden by <u>O'Shea</u>, the three <u>Wallace</u> decisions, and by <u>Kaye</u> and <u>DRA</u>. This motion must therefore be denied.

## POINT II: PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING THEIR ENTITLEMENT TO AN ORDER ENJOINING ALL COURT APPEARANCES IN NEW YORK CITY CRIMINAL COURT

Injunctive relief, such as the preliminary injunction sought by Plaintiffs, is "an extraordinary remedy never awarded as of right." <u>Winter v. NRDC, Inc.</u>, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of proof in establishing that (a) they are likely to succeed on the merits; (b) they are likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in their favor, and (d) an injunction is in the public interest. <u>Id.</u>, at 20. The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." <u>L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. N.Y.</u>, 2018 WL 2390125, *13 (E.D.N.Y. May 25, 2018) (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where: (i) an injunction is "mandatory" (i.e., altering the status quo rather than maintaining it); or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." <u>New York v. Actavis PLC</u>, 787 F.3d 638, 650 (2d Cir. 2015). In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. <u>See id.</u> (quoting <u>Beal v. Stern</u>, 184 F.3d 117, 123 (2d Cir. 1999) and <u>Doe v. New York University</u>, 666 F.2d 761, 773 (2d Cir. 1981)). This heightened standard applies here, since the requested injunction is "mandatory" because it would require the alteration of the current status quo by ceasing scheduling of any and all in-person criminal proceedings

in New York City Criminal Court, which is already underway.

### A. Plaintiffs Fail To Establish That Irreparable Harm Is Imminent If Preliminary Injunctive Relief Is Not Granted

Plaintiffs allege irreparable harm in the form of (1) disruption to their organizational operations; and (2) a fear for the health of their clients, staff, and community.  Dkt. No. 4, pp. 8-16. Neither alleged "harm," under the present circumstances, is sufficient to warrant the granting of preliminary injunctive relief closing the Criminal Court to any and all in-person appearances.

"In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." Rodriguez by Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998) (internal quotation marks and citation omitted).  The Second Circuit has emphasized that irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Id.  "'If irreparable harm is remote, speculative or a mere possibility the motion must be denied.'" Bilenker v. Broadridge Fin. Solutions, 2018 2018 WL 6031159, *2 (E.D.N.Y. Nov. 16, 2018) (quoting Dorey v. Nat'l Union Fire Ins. Co., 934 F.2d 30, 34 (2d Cir. 1991)).  "The law of this Circuit requires the party moving for a preliminary injunction to show that it will suffer imminent irreparable harm," Jayaraj v. Scappini, 66 F.3d 36, 40 (2d Cir. 1995), and that it "'must do so with evidence, and may not rely on vague claims of potential harm.'" Utica Mut. Ins. Co. v. INA Reinsurance Co., 2012 WL 12874471, *5(N.D.N.Y. Nov. 6, 2012) (quoting Caldwell Mfg. Co. North America, LLC v. Amesbury Group, Inc., 2011 WL 3555833, *3 (W.D.N.Y. Aug. 11, 2011)) (emphasis added).  An application for preliminary injunctive relief must be supported by "competent" evidence, such as sworn affidavits, and not just "unverified allegations of the pleadings and motion papers." Johnson v. Doe, 2001 U.S. Dist. LEXIS 366, *6 (S.D.N.Y. Jan. 16, 2001).

Plaintiffs' submissions fail to provide proof of any harm satisfying Plaintiffs' burden.  Most of the content of the Plaintiffs' declarations (1) recounts Plaintiffs' frustration that the courts started in-person appearances earlier than Plaintiffs thought they had been led to believe they would; (2) explains

that the early return has disrupted their plans; and (3) details that they are ill-prepared to work on any matter requiring an in-person appearance. They describe such things such as incomplete plans to (1) implement new technology, Dkt. No. 7 ¶ 52; (2) disseminate surveys, Dkt. No. 6 ¶ 14; and, (3) develop recommendations in working groups for how to assign appearances, Dkt. No. 7 ¶41, as endeavors that have somehow been disrupted by the requirement that Plaintiffs, collectively employing over 900 attorneys, to return to court for fewer than ten cases per day per courthouse. Plaintiffs similarly assert that their employees are working remotely outside of New York City, including in quarantine-required states, and that their staff have childcare issues or live with elderly persons and are not available to return to work. They also complain about time and effort purportedly expended by them in collaborating with the defendants, including retaining their own public safety expert to whom they seem to believe the defendants are bound to defer, only to have the collaboration cut short by the issuance of the minimal appearance requirements of the in-person order. Dkt. No. 7 ¶¶ 8-22.

Plaintiffs have thus demonstrated nothing beyond the fact that their work activities have altered because the roll-out of the Return Plan has not gone smoothly for them; and Plaintiffs have determined, in light of their own lack of preparation, to send managers to court instead of staff attorneys. See generally, Dkt. Nos. 1, 4, 6-11. But this is not irreparable injury. There is no evidence in the record sufficient to support a finding that requiring such a limited number of attorneys and clients to appear in court, while employing all recommended protocols, social distancing and using protective equipment, and excusing those individuals with high-risk factors when requested, indicates that irreparable harm is imminent to any of these individuals. Instead, the evidence before the court establishes only that the plaintiffs wish to return to even the most limited in-person court appearances on their own timeline, whenever they deem appropriate. This is a far cry from irreparable injury.

With regard to their claims of health risks associated with any and all court appearances amounting to imminent "irreparable harm," Plaintiffs' declarations fail to allege that any person with

17

a disability – attorney or client – under the Plan has been forced to appear in court and  has or will experience any "irreparable injury" for failing to do so.  Instead, the declarations document that (1) both attorneys and clients have had appearances excused, see e.g. Dkt. No. 6 ¶ 32; Dkt. No. 7, ¶ 69,[5] and (2) cases in which clients failed to appear were administratively adjourned. See e.g. Dkt. No. 7 ¶ 66. Although Plaintiffs allege that they need not show that harm has actually occurred, Dkt. No. 4 p. 17, the law requires that they show an "actual and imminent threat," Brennan Ctr. for Justice, 20182018 WL 637424, *3, and the evidence submitted fails to establish such an imminent threat.

Instead of establishing an actual imminent harm, Plaintiffs' declarations allege a generalized "fear" for their attorneys' and others' well-being because of the dangers of COVID-19.  But this court has already determined that "[s]imilar anxiety is shared by virtually every citizen who is obeying stay at home and self-distancing directives. Such generalized fears and anxiety do not constitute risk of irreparable harm." Monterosa v. Decker, 2020 WL 1847771, *7(S.D.N.Y. April 11, 2020) (discussing fear of contracting COVID).  Here, Plaintiffs fail to submit any sworn declarations from any staff member or client, or any other competent non-conclusory evidence, and indeed admit they do not even know which clients or attorneys have health conditions rising to the level of "disabilities." [6] Moreover, Plaintiffs altogether fail to account for the safety protocols in place—and the exceptionally limited daily number of appearances per courthouse.  Plaintiffs' submissions are therefore insufficient to meet their burden to establish a particularized, imminent threat of irreparable harm. Moreover, in

---

[5] In many instances, attorneys have been excused, and the court has directed and permitted them to substitute another attorney from their organization.

[6] Plaintiffs' declarations make repeated conclusory references to staff members and clients with medical conditions making them more susceptible to COVID, see e.g. Dkt. No. 6 ¶¶ 29-31; Dkt. No. 7 ¶¶ 3-4, 59; Dkt. No. 8 ¶¶ 3-4; Dkt. No. 9, ¶ 4; Dkt. No. 10 ¶¶ 10, 16; Dkt. No. 11 ¶¶ 12, 18-23.  But such references cannot support a claim of any specific injury or threat,.  Indeed, Plaintiffs affirmatively aver that they do not even know which clients have such conditions.  See e.g. Dkt. No. 6 ¶¶ 14, 28; Dkt. No. 7 ¶ 39; Dkt. No. 8 ¶¶ 30, 32; Dkt. No. 10 ¶ 13; Dkt. No. 11 ¶ 17.

light of the sweeping relief that Plaintiffs seek on this motion—an injunction barring <u>all</u> in-person court appearances, regardless of medical condition or alleged disability, Dkt. No. 3—Plaintiffs should have offered some evidence of an imminent and identifiable threat of harm other than conclusory and, admittedly largely uninformed, statements by administrators.

In addition to relying on inconvenience and abstract fears to establish irreparable injury, Plaintiffs also make a scatter-shot series of arguments that, on any examination, fail to provide any support for their application for injunctive relief. <u>First</u>, Plaintiffs argue that the opening of the criminal court to in-person appearances "interferes with" Plaintiffs' "ability to represent their tens of thousands of clients." But this claim, too, is speculative and hypothetical. The declarations discuss only extra burdens on attorneys' time now that Plaintiffs' extensive staffs have to handle a very small number of appearances in court—not any identified real-world problem with representation. <u>See generally</u>, Dkt. Nos. 1, 4, 6-11

<u>Second</u>, Plaintiffs rely on <u>Make the Rd. New York v. Cuccinelli</u>, 419 F.Supp.3d 647, 665 (S.D.N.Y. 2019), to claim that they can satisfy their burden of establishing irreparable harm by showing harm to "the public at large," Dkt. No. 4 at p. 18. This reliance is misplaced. While that court discussed potential harm to the public, it actually held that plaintiffs had established that they, themselves, would experience irreparable harm. In fact, the language quoted by the Plaintiffs states, "it is impossible to argue that there is no irreparable harm for these individuals, <u>Plaintiffs</u>, and the public at large." <u>Id.</u> (emphasis added). Here, as discussed above, Plaintiffs cannot establish that <u>Plaintiffs</u>, much less the public at large, will suffer irreparable harm in the absence of preliminary injunctive relief. They cannot resort to fears of "community harm" as an alternative.

In addition, Plaintiffs have not offered any evidence even tending to establish that the opening of New York's Criminal Courts to ten appearances per day will, without more, cause any irreparable "community harm." Instead, Plaintiffs submit a declaration from an epidemiology professor, Dkt.

No. 12, and argue about the significant dangers of COVID-19, of which everyone is well aware. Dkt. No. 4 at p. 14.  But they do not submit evidence or opinion supporting any inference that the small number of cases being heard per day per courthouse pursuant to the Return Plan will cause a threat of imminent harm to the community. Indeed, their epidemiologist (Dkt. No. 12) does not so state; rather, at base, he opines that any appearance in any public place, such as a court, is likely to heighten risks of viral transmission.  But followed to its logical conclusion, Plaintiffs position would mean that neither the New York nor federal courthouses could open to any in-person operations, and must instead await a vaccine or cure, when and if this ever occurs. Nothing in Plaintiff's submissions establishes that simply opening the courthouses to limited appearances is the same thing as imminent irreparable harm.

Finally, Plaintiffs claim that mere allegation of a violation of their right to substantive due process is sufficient to "presume" irreparable harm.  Dkt. No. 4 at p. 2.  They are incorrect.  A series of cases limits the presumption of harm on which Plaintiff seek to rely to cases involving First Amendment and related rights. See, e.g., Galvin v. New York Racing Ass'n, 70 F. Supp. 2d 163, 190 (E.D.N.Y. 1998) (while irreparable harm is presumed in First Amendment cases, "violation of due process rights, without more, is insufficient to establish irreparable harm . . . ."); Barrett v. Harwood, 967 F. Supp. 744, 746 (N.D.N.Y. 1997) ("the cases where courts have held that a constitutional deprivation amounts to irreparable harm are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy, or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief . . . ."). Thus, Plaintiffs' raw allegation of a substantive due process claim is also insufficient to establish irreparable harm.

Plaintiffs have not met their burden of establishing that they will be irreparably harmed if a preliminary injunction is not granted against the Criminal Courts' scheduling of ten in-person

appearances per day in each courthouse.   An injunction should not issue.

**B. Plaintiffs Are Not Likely to Succeed on The Merits of Their Claims**

Plaintiff cannot establish that they are likely to succeed on the merits of their claims because the ADA, Rehabilitation Act and Fourteenth Amendment Due Process claims alleged by the Plaintiffs are meritless or moot.

1. Plaintiffs Cannot Establish a Likelihood of Success on the Merits of their ADA or Rehab Act Claims

The gravamen of Plaintiffs' case, and the basis for their requested injunction, is the contention that Defendants' re-opening plan fails to provide a reasonable accommodation for Plaintiffs' clients and staff who are at a heightened risk for COVID-19 infection, in violation of the ADA Title II and Rehab Act.  Assuming arguendo that Plaintiffs have standing to raise these claims, which is dubious,[7] Plaintiffs have no clear or substantial likelihood of success on the merits.

To establish a claim under either Title II of the ADA or section 504 of the Rehab Act, a plaintiff must demonstrate that it (1) is "a qualified individual with a disability;" and (2) was "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or

---

[7] The Plaintiffs have not demonstrated that they have constitutional standing to bring a claim in their own right because they have not demonstrated injury-in-fact. All plaintiffs must meet "the constitutional prerequisites of standing: (1) injury-in-fact, (2) causation, and (3) redressability." Mental Hygiene Legal Servs. v. Cuomo, 13 F. Supp.3d 289, 298-300 (S.D.N.Y. 2014) (internal quotation marks and citation omitted) (finding that even in instances where a public defender's clients' rights are affected by a law or policy, the public defender does not have standing to challenge such policy because it may make litigation more challenging when the core mission of the public defender is to advocate for the rights of its clients). Plaintiffs' claims that they had to rearrange staffing or re-assign supervisors from managerial responsibilities did not create a drain on resources or divert them from core activities sufficient to confer organizational standing. Moreover, Plaintiffs cannot rest their claims of relief on the legal rights or interests of third parties. Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Plaintiffs have not shown the relationship with their employees and clients to be "close" or that there is a hindrance to their employees and clients advancing their own rights under the ADA.

was otherwise discriminated against by the defendant because of his disability."[8] McElwee v. County of Orange, 700 F.3d 635, 640 (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir.2003)). "Under both statutes, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services.'" Id. (quoting Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir.2004)).

A "public entity need not 'employ any and all means to make' services accessible; the ADA and [Rehabilitation Act] 'require[ ] only reasonable modifications that would not fundamentally alter the nature of the service provided' or 'impose an undue financial or administrative burden.'" Martinez v. Cuomo, 2020 WL 2393285, *4 (S.D.N.Y. May 12, 2020) (quoting Tennessee v. Lane, 541 U.S. 509, 531–32 (2004)). See also McElwee, 700 F.3d at 641 (an accommodation that "would impose an undue hardship on a program's operation or 'would fundamentally alter the nature of the service, program, or activity,'" need not be provided by a public entity). A public entity need not provide a requested or preferred accommodation, and the chosen accommodation need not be "perfect." Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 189 (2d Cir. 2015).

Plaintiffs concede in their declarations and Complaint that: they have various ways of seeking accommodations to assist in their accessing the courts on behalf of their clients; that, at the discretion of the judge; appearances for which their clients were unready have been adjourned, that their clients have been excused from in-person appearances when they assert they have personal risk factors;  and that individual attorneys have been excused and/or  permitted to substitute alternative counsel on the same basis. Dkt. Nos. 1, 6-10.   See also Amaker Decl. ¶¶ 20-23; Statement of Facts, infra, pp. 8-9 (setting out reasonable accommodation procedures for Criminal Court appearances). Nowhere do Plaintiffs explain why such accommodations, even if not preferred by Plaintiffs, or perfect,  are not

---

[8] While a plaintiff must also allege that a defendant is subject to the statutes, McElwee, 700 F.3d at 640, that issue is not relevant here.

reasonable ones. Indeed, the submissions on this motion fail to provide any real-world facts sufficient to support a reasonable inference that the Return Plan somehow denied either the Plaintiff organizations or their clients reasonable access to the Courts.

Moreover, Plaintiffs' claim of failure to accommodate is now moot. A claim for injunctive and declaratory relief is moot when the plaintiff "can no longer obtain any legally cognizable benefit from the declaratory and injunctive relief it seeks." Parkway Hosp. v. Shah, 460 F. App'x 21, 23 (2d Cir. 2012). "Thus, 'if an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, we must dismiss the case' as moot." Dessaint v. Lignel, 584 F. App'x 30, 31 (2d Cir. 2014) (quoting United States v. Blackburn, 461 F.3d 259, 261 (2d Cir. 2006)).

As discussed in the declaration of Judge Amaker, the short notice that Plaintiffs claim they were given for the first appearances pursuant to the Return Plan, which they claimed did not permit them to seek reasonable accommodations, is no longer an issue, since, going forward, defendants and attorneys should generally receive at least a week's notice of appearances. Amaker Decl. ¶ 28. In addition, Judge Amaker has explained that no formal changes to the ten appearances/day/courthouse policy have been approved at present, and that due notice would be provided for any such changes. Id. ¶ 29. Therefore, Plaintiffs' claims that they will necessarily be taken by surprise, and do not have ample time to apply for an accommodation in advance of a scheduled appearance appear moot, and cannot now provide any basis for an injunction.

Plaintiffs fall far short of meeting their burden on this motion of establishing a clear or substantial likelihood of success on the merits. Where, as here, Plaintiffs fail to cite "a single precedent" that stands for the proposition they ask the Court to adopt, they "have not come close to establishing a clear likelihood that the law entitles them to success on the merits of their" claim. Bergamaschi v. Cuomo, 2020 WL 1910754, *15 (S.D.N.Y. April 20, 2020) (denying preliminary

injunction application to require the state parole board to include a bond hearing as part of its parole revocation procedures in the absence of any precedent supporting such a requirement under the Due Process Clause).  Because Plaintiffs cannot establish that they are likely to succeed on their ADA or Rehab Act claims, Plaintiffs' motion for a preliminary injunction should be denied.

2.   Plaintiffs Also Cannot Establish a Likelihood of Success on the Merits of their Substantive Due Process Claim

Generally, to establish a substantive due process violation, a plaintiff must demonstrate that they "ha[ve] been deprived of a protected interest in property or liberty." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).  The existence of a protected liberty or property interest is "the first inquiry in every due process challenge . . . ." Id.  Further, such a claim requires "government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense . . . ," Scaccia v. Stamp, 700 F. Supp. 2d 219, 235 (N.D.N.Y. 2010), and "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Charles v. Orange Cty., 925 F.3d 73, 85 (2d Cir. 2019). Substantive due process rights do not protect against government action that is merely "incorrect or ill-advised." Cunney v. Bd. of Trs. of Grand View, 660 F.3d 612, 626 (2d Cir. 2011).

Plaintiffs do not argue in their memorandum of law in support of the motion for a preliminary injunction that they are likely to succeed on the merits of their due process claim.  Dkt. No. 4. Moreover, they could not do so.  In the Complaint, their allegations, at most, amount to a claim that that Defendants violated their substantive due process right to a "safe working environment" inside courthouses. Dkt. Nos. 1, 4, 6-11. But Plaintiffs cannot succeed on this theory of constitutional liability because it has already been explicitly rejected by the Supreme Court. Collins v. Harker Heights, 503 U.S. 115, 125–29, (1992) (rejecting as "unprecedented" the claim that the Due Process Clause "guarantee[d] municipal employees a workplace that is free of unreasonable risks of harm"). "The Due Process Clause . . . [does not] guarantee employees a workplace that is free of unreasonable risks of

harm." <u>Collins</u>, 503 U.S. at 129. In addition, Defendants' limited, careful reopening plan is plainly not "conduct intended to injure in some way unjustifiable by any government interest" and does not "rise to the conscience-shocking level." <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 849 (1998). Accordingly, because Plaintiffs fail to state a substantive due process claim, they fail to establish that they are likely to succeed on the merits of such a claim.[9]

## C. The Balancing of Hardships and the Public Interest Favors the Limited Re-Opening of Criminal Court.

The equities and public interest prongs of the preliminary injunction standard, which "merge when the Government is the opposing party," <u>Nken</u>, 556 U.S. at 435, also weigh in Defendants' favor. <u>See, e.g.</u>, <u>Coronel v. Decker</u>, 2020 WL 1487274, *7 (S.D.N.Y. March 27, 2020) ("Where the Government is the opposing party, the final two factors in the temporary restraining order analysis— the balance of the equities and the public interest—merge."). The public has a legitimate, indeed an overwhelming, interest in advancing the resolution of serious criminal charges against individuals not in custody, promoting resolutions of a backlog of thousands of matters, Amaker Decl. ¶ 18, and in implementing the first careful step in reopening of the courts so as to better provide the all essential services provided by those courts to the public. The criminal justice system is also a critical to the well-being of the public and the community, and provides a vital public service. <u>United States v. Heimann</u>, U.S. Dist. LEXIS 11990, *4 (S.D.N.Y. 1982).[10] "[C]ourts in this Circuit have held, 'the public's interest in the effective enforcement of the criminal law is [of] paramount public concern.'" <u>SEC v. Platinum Mgmt. (NY) LLC</u>, 2017 WL 2915365, *6 (E.D.N.Y. July 7, 2017) (quoting <u>SEC v. Shkreli</u>, 2016 WL 1122029, *7 (E.D.N.Y. Mar. 22, 2016)). These significant individual, community,

---

[9] To the extent that Plaintiffs are attempting to invoke the "state created danger" exception to this well-established rule, they cannot. <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 533 (1993).

[10] A Westlaw citation for this case could not be located.

and societal interests outweigh the Plaintiff organizations' interests in avoiding a small number of in-person court proceedings, which are held under circumstances reflecting the best available public health standards.

## Conclusion

For the foregoing reasons, Defendants respectfully request that the preliminary injunction be denied, and the Court grant such other and further relief as it deems just and equitable.

Dated:  New York, New York
        June 20, 2020

                                        Respectfully submitted,

                                        LETITIA JAMES
                                        *Attorney General*
                                        *State of New York*
                                        <u>Attorney for Defendant Lawrence Marks</u>
                                        By:

                                        By: _____ <u>Adrienne J. Kerwin</u>
                                        Adrienne J. Kerwin
                                        Assistant Attorney General
                                        The Capitol
                                        Albany, New York 12224-0341
                                        (518) 776-2606
                                        Adrienne.Kerwin@ag.ny.gov


                                        EILEEN D. MILLET
                                        Counsel,
                                        Office of Court Administration
                                        25 Beaver Street - 11th Floor
                                        New York, New York 10004
                                        (212) 428-2150


                                        By:__Elizabeth A. Forman
                                        Elizabeth A. Forman
                                        Anthony Perri, Deputy Counsel

26